**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Eddie POPE, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Larry NORRIS, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joshua JAMES, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert P. WILLIAMSON,**
**Defendant-Appellant.**

**Nos. 77–5082 to 77–5085.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1977.

Decided April 6, 1978.

Rehearing and Rehearing En Banc Denied May 5, 1978.

Certiorari Denied May 30, 1978.
See 98 S.Ct. 2828.

Certiorari Denied June 5, 1978.
See 98 S.Ct. 2856.

Burton Marks, Los Angeles, Cal., Michael C. Hennenberg, Fink & Greene, Cleveland, Ohio, for defendant-appellant Eddie Pope.

Frederick M. Coleman, U. S. Atty., Clarence B. Taylor, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff-appellee.

Joshua James, pro se; Kathleen C. King, Cincinnati, Ohio (Court-appointed CJA), for defendant-appellant Joshua James.

Michael G. Dane, Cleveland, Ohio, for defendants-appellants Larry Norris and Robert P. Williamson.

Before PHILLIPS, Chief Judge, and WEICK and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Defendants Eddie Pope, Joshua James, Larry Norris, and Robert P. Williamson were found guilty of conspiring to distrib-

ute heroin, in violation of 21 U.S.C. § 846. Of the numerous issues raised in their consolidated appeals, only one merits extended treatment. That issue, common to all but raised solely by the defendant Joshua James, concerns the construction of the mandatory provisions of the Jencks Act contained in 18 U.S.C. § 3500(d).

We affirm.

The government's proof at trial basically established a chain conspiracy.[1] The evidence showed that defendants Pope and James in California supplied the heroin to defendants Norris and Williamson for distribution in the Cleveland area. Unindicted co-conspirators Sheldon Blackmon and Letha Lynch were the link between the California group and the Cleveland group, buying from the former and selling to the latter. They also were the government's chief witnesses at the trial.

During the government's case-in-chief and at the beginning of the cross-examination of a witness who preceded Sheldon Blackmon on the stand, counsel for defendant Norris asked if the government possessed any further Jencks Act material for that witness. Government counsel replied that he did not. To speed up the proceedings, the trial judge then asked if the prosecution had any more Jencks Act material as to other witnesses whom it planned to call, and again the counsel for the government responded that he did not. During direct examination of Blackmon, counsel for defendant Williamson also asked if all Jencks material pertaining to Blackmon had been supplied and was again informed by government counsel that all such information had been furnished.

After direct and cross-examination of Blackmon had been completed and the examination of the following witness had begun on the following day, the government attorney approached defense counsel and informed them that he had failed to provide a statement by Blackmon which had been taken by government agents in California. He stated that it would be made available to counsel as soon as he had reviewed it. In conference in the judge's chambers the Assistant United States Attorney represented that he had inadvertently forgotten the statement because it related to an incident occurring after the conspiracy had ended and concerned matters which the government had no intention originally of proving at the instant trial. During the course of the interrogation of Blackmon, however, the government concluded that Blackmon's knowledge concerning the later events was relevant as bearing upon scheme and plan under Rule 404(b), Federal Rules of Evidence, and successfully elicited the information. Government counsel was reminded of the existence of the later statement only after the examination of Blackmon had been completed by both sides.

Counsel for defendants Pope and James promptly moved to dismiss the indictment with prejudice in the light of this discovery, and were joined by counsel for Norris and Williamson. Alternately they asked for either a mistrial and failing that, moved the court to strike the entire testimony of Blackmon in accordance with the cited provision of the Jencks Act, 18 U.S.C. § 3500(d).

In ordering a further inquiry into the matter, the trial judge, justifiably perturbed, characterized the government's failure to produce the statement as "gross mismanagement" and "gross mishandling" of the case and at one time also observed that "either the government is so completely unprepared in this case or there is a misrepresentation to this Court." He did not, however, at any time make the unequivocal finding that there had been a deliberate suppression of the statement or that the withholding of the statement was in bad faith.[2] The hearing which followed

---

1. The district judge explained that a chain conspiracy is characterized by "various activities concerned with or related to a common objective, so that each conspirator, in a chain-like manner, performs a separate and distinct function which serves as a link or phase in the accomplishment of the over-all objective or scheme."

2. While James' counsel on this appeal urges that we should infer bad faith from the government conduct, his trial attorney and defendant

brought out the fact that Special Agent William Johnson of the Los Angeles Regional Office of the Drug Enforcement Administration had taken Blackmon's statement and had procured his signature to it. Also another agent, Roger Kehrier, who had knowledge of the statement had been in the courtroom at the time much of Blackmon's testimony on direct examination had taken place. The trial judge closely interrogated both the Assistant United States Attorney and Agent Johnson concerning the failure to disclose the statement earlier. Johnson professed that he thought that the government attorney knew of it. The government attorney on his own part represented to the court:

> Now, with respect to the statements by Mr. Blackmon, what I think happened there, through inadvertance (sic), I forgot about it, and let me explain what I mean. We originally were not going to use anything pertaining to the December 10 incident in California; and that did not become relevant until recently, we decided to request permission of the court to use a like and similar act. Otherwise it would not have been used.
>
> The Court: That's not the point. You are still under a duty to turn it over, Mr. Taylor.
>
> Mr. Taylor: It just struck my mind, that's all I can tell you.
>
> Now, with respect to the report from California: I'm doing a half a million things, and I got it yesterday. I had to go home and go to Reserve Meeting and I didn't get a chance to look at it. That's exactly what happened.

Tr. at 457–58.

The California statement taken by Agent Johnson and signed by Blackmon on December 10, 1975 centered primarily upon unconsummated negotiations between December 3 and 10, 1975 between Blackmon and defendant Joshua James for the further sale of drugs, whereas the conspiracy was alleged in the indictment to have taken place "[a]s early as the 27th day of August, 1975, and continuing thereafter until on or about the 16th day of October, 1975, the exact dates to the grand jury being unknown. . . ." The California statement was in all respects consistent with Blackmon's testimony at the trial. It also was consistent with Blackmon's grand jury testimony, a transcript of which had been timely furnished defense counsel.[3]

Following the hearing, the trial judge indicated that he would "accord all of the lawyers for all of the defendants an opportunity to re-examine Mr. Blackmon concerning any aspect of the evidence that is alluded to that appears in either the signed statement of Sheldon Blackmon or the report of Special Agent William P. Johnson," adding further, "if I have not ruled upon it, I do overrule the motions in view of the opportunity that I have extended to all counsel to examine—re-examine, I should say, Mr. Blackmon upon any aspects of a newly-produced Jencks Act material."

The defendants declined to avail themselves of the opportunity accorded them to recall Blackmon for cross-examination.

■ On the foregoing facts, defendant James asserts that if dismissal of the charges outright was not required, the trial judge was compelled by the mandatory provisions of subsection (d) either to order a mistrial or to strike altogether the testimony of Blackmon from the record. 18 U.S.C. § 3500(d) provides:

> If the United States elects not to comply with an order of the court under paragraph (b) or(c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the in-

---

Pope's attorney specifically disclaimed any charge of bad faith in the district court.

**3.** In the grand jury transcript available to defense counsel there was reference to exhibit 12 in the examination of Blackmon, that being in fact the same statement which he had given on December 10, 1975.

terests of justice require that a mistrial be declared.

The employment of the term "elects" in subsection (d) consciously tracks the language of Mr. Justice Brennan in the concluding paragraph of his majority opinion in *Jencks v. United States,* 353 U.S. 657, 672, 77 S.Ct. 1007, 1015, 1 L.Ed.2d 1103 (1957):

> We hold that the criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at the trial. Accord, *Roviaro v. United States,* 353 U.S. 53, 60–61, [77 S.Ct. 623, 627–628, 1 L.Ed.2d 639]. The burden is the Government's, not to be shifted to the trial judge, to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession.

It is evident from its legislative history that the Jencks Act was principally designed to make certain that *Jencks v. United States* was not misinterpreted by lower courts to expose government files in criminal prosecutions to blind fishing expeditions. S.Rep.No. 981, 85th Cong., 1st Sess., reprinted in [1957] U.S.Code Cong. & Admin. News 1861, 1862–63. Also apparent is a congressional concern with the cited operative language of *Jencks v. United States,* which appeared to hold that where the government elected not to disclose a witness' statement, the only remedy was dismissal with prejudice. Concluding that this was too harsh a result, an amendment to the original language of the proposed act by Senator Clark of Pennsylvania provided alternative remedies of striking the testimony of the witness or of declaring a mistrial. Thus, in Senate debate on the Act, the following colloquy took place between Senator O'Mahoney of Wyoming and Senator Ervin of North Carolina:

Mr. O'MAHONEY. The remedies are provided in subsection (c) [the present subsection (d)], which, as I now recall, is the draftsmanship of the Senator from Pennsylvania [Mr. Clark].

Let me read it:

(c) In the event that the United States elects not to comply with an order of the court under paragraph (b) hereof to deliver to the defendant any statement, transcription, or record, or such portion thereof as the court may direct, the court shall take such action, including but not limited to striking from the record the testimony of the witness, declaring a mistrial, or ordering the dismissal of the indictment, as the interests of justice require.

Mr. ERVIN. In other words, the court has alternatives.

Mr. O'MAHONEY. Yes, there will be three possible courses of action.

Mr. ERVIN. If the Government has substantial evidence, from the testimony of other witnesses, to establish the guilt of the defendant on the charge which has been made, the court can permit the Government to proceed on the basis of the testimony of the other witnesses, but the court could deprive the Government of the benefit of the testimony of the witness who is the author of the document which the Government refused to produce; is that correct?

Mr. O'MAHONEY. That is correct.

Mr. ERVIN. I think the amendment takes care of the Jencks decision in this respect. The Jencks decision went too far in allowing the Government only one course of action, namely, the dismissal of the case, if the Government did not produce the document.

103 Cong.Rec. 15784 (1957).

■ As finally enacted, the language of subsection (d) incorporated an amendment offered by Senator Hruska deleting the alternative of dismissal from the section altogether. In his statement made a part of the record in the debate Senator Hruska observed:

The purpose of my amendment is to strike the third alternative; that is to say, the order dismissing the indictment. Under the amendment the trial judge would be limited to either striking the testimony from the record or declaring a mistrial.

In a criminal trial dismissal is equivalent to acquittal. It is not appealable. This means that if the trial judge should dismiss the indictment the defendant would be freed. Inasmuch as he had already been placed in jeopardy, he could not be reindicted according to the understanding which I have of the law pertaining to that situation.

103 Cong.Rec. 15935–36 (1957).

We believe that use of the term "elects" in subsection (d), tracking as it does Justice Brennan's language in *Jencks v. United States,* evidences a congressional concern primarily with the situation in which the United States, having called a witness in a criminal case and then having been ordered to produce any statements, was faced with the dilemma of disobeying the court order or risking the disclosure of sensitive or privileged material. Thus we believe use of the term refers to a conscious choice given the government to disclose the statement it possesses or to suffer the mandatory alternatives of either having the entire testimony of the witness stricken or in the court's discretion, a new trial ordered.

This construction is consistent with the rest of the Jencks Act. If the government possesses a statement [4] which it believes is not disclosable under the Jencks Act, it may note its objection to the admissibility of the statement and submit the issue to the district court under subsection (c) [5] with the attendant consequence that the court may order its disclosure to the defense over the government's objection, following an *in camera* inspection. On the other hand, if it deems the risk of disclosure too great in the face of its lack of control over the decision by the trial court, it may make the election under subsection (d) and suffer the mandatory consequences called for therein.

■ Though lacking in judicial interpretation, the foregoing analysis persuades us that subsection (d) was not designed to extinguish the normal exercise of judicial discretion by the trial judge where the Act may have been violated by oversight or negligent conduct not amounting to a conscious election. Thus while it is obvious to us here, as it was to the able trial judge, that the government's failure to disclose the statement was a violation of the Jencks Act, we hold that the trial judge was not bound by the limited alternatives of subsection (d) but instead was entitled to apply such a remedy as the justice of the case might require under the circumstances. In turn, we see our review as being directed to a determination of whether the trial judge abused his discretion in refusing to grant a new trial or to strike the testimony and instead according the parties an opportuni-

---

**4.** *See e. g., United States v. Nickell,* 552 F.2d 684 (6th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 2233, 56 L.Ed.2d 402 for a definition of a "statement."

**5.** 18 U.S.C. § 3500(c) provides:

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

ty to call Blackmon to the stand for further cross-examination.

The Supreme Court has held that Jencks Act violations may be subject to the harmless error rule, *Rosenberg v. United States,* 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959), although holding that the doctrine itself must be "strictly applied." *Goldberg v. United States,* 425 U.S. 94, 111, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976). In *Rosenberg,* the government made objection to disclosure of the statements sought under the Jencks Act, but delivered them over to the district court for *in camera* inspection under circumstances in which it was held that the trial court erred in denying access to the defense. In *Goldberg* the trial court, without an inspection sustained the government's objection that certain writings were protected as the work product of government attorneys. The Supreme Court remanded on the ground that the trial judge erred in holding that the work-product doctrine barred production under the Act and ordered an inspection of the documents.

Thus in both cases the government, instead of relying absolutely upon its election to refuse without explanation under subsection (d) and thus suffering the consequences, acted under subsection (c) by submitting the matter to the district court for a ruling.

Since an election by the government under subsection (d) not to disclose Jencks Act material would leave the trial court with no discretion but to strike the testimony of the witness altogether, or to order a new trial, application of the harmless error rule in such a situation would have required us on review to determine if a failure to strike the entire testimony of the witness could not have adversely affected the outcome of the trial. The logic for this conclusion, of course, is that the statutory requirement is absolute and if the court had not erred, the testimony would either have been stricken or a new trial would have been held without the jury being exposed to the testimony of that witness (unless perhaps the statement had by then been timely disclosed). Further, if the contents of the withheld state-

ment were not known to the trial judge, it would be impossible to determine if their nondisclosure was harmless. In the cases examined by the Supreme Court, however, *see Goldberg* and *Rosenberg, see also Clancy v. United States,* 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961), and *Campbell v. United States,* 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963), the Supreme Court acted not upon a determination of whether it was error for the trial court to have failed to exclude all of the testimony of the witness, but instead whether the failure to furnish the statement itself caused any actual prejudice to the defense in the context of all the circumstances of the trial. Likewise, our court in *United States v. Dye,* 508 F.2d 1226 (6th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975), held not clearly erroneous a finding of the district court that there was no prejudice to the defendants as a result of the prosecution's failure to furnish eight statements which were ultimately found to have been proper Jencks Act material. There, as here, the government had argued that the failure to produce the statements was an oversight and unintentional. The court observed the statements themselves "would have provided little, if any, material for cross-examination by counsel for defendants." And in *United States v. Chitwood,* 457 F.2d 676 (6th Cir.), *cert. denied,* 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972), we held that the district court erred in ruling without an *in camera* hearing that certain reports were not producible statements. However, because the case presented "extraordinary circumstances," we found upon examination of the documents that it was perfectly clear that "the defense was not prejudiced."

■ Here, while the trial judge did not specifically find that the government's failure timely to furnish the statements was harmless error, we are fully satisfied upon the record that upon the careful inquiry made he concluded that the government error was curable and in fact cured by the remedy he provided in permitting the proofs to be reopened so that Blackmon

could be further cross-examined on the basis of the omitted statement. We agree.

The substance of the information in the statement was already known by the defense through its possession of the grand jury transcript, and did not depart from the testimony of Blackmon on either direct or cross-examination. The only possible benefit, and one which is stressed by the defense on appeal, is that they could have challenged Blackmon's denial under oath that he had in fact given the statement. While this is true, the opportunity to bring that out was accorded them by the trial judge in allowing Blackmon to be recalled.

It is also apparent that any concern by the trial judge that bad faith may have been involved was mollified as he later became more acquainted with the circumstances. The defense counsel expressly disclaimed any assertion of bad faith. Although the government's neglect was properly subject to the severe criticism of the court and represented an inadequate performance of its affirmative duty to search out such statements and disclose them, it was not shown to have been purposeful. This is evident by the fact that the statement was in fact disclosed, that it did not depart from the testimony given on the stand, and that it was duplicated by the transcript of the grand jury testimony which was already in the possession of the defense.

Under the circumstances, we hold that the government's error in not timely furnishing the statement was rendered harmless by the remedy accorded the defendants by the trial court and that the trial judge's refusal to impose a more stringent penalty did not amount to an abuse of his discretion, nor did § 3500(d) apply to compel it.

Numerous other alleged errors are raised by counsel for defendants in their very careful briefs, but none of them in our judgment requires extended discussion.

■ Prior to trial, the government, having suffered an adverse decision in the trial court concerning discovery, requested dismissal of the indictment without prejudice under Rule 48, Fed.R.Crim.P., under the mistaken belief that in doing so it might obtain an interlocutory ruling on the order by appeal. Shortly thereafter the defendant was re-indicted upon the same charge, probably when the mistake was realized. Defendant Pope's claim that it was error for him to have been re-indicted is without merit since the dismissal, viewed in its context, was without prejudice. *See* 8B Moore's Federal Practice ¶ 48.02[3] at 48–10 (1977). The delay involved was minimal and there was no prejudice in the delay either alleged or shown.

■ Likewise counsel urge that it was improper for the court to have permitted the introduction into evidence of Blackmon's testimony concerning the events which occurred in California after the specific dates set forth in the indictment. The evidence tended to show that after October, 1975, defendant Joshua James had negotiated with Blackmon for the further sale of narcotics but that this had failed. The defendants rely on *Fiswick v. United States*, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946), and *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1952), for the proposition that the acts of a conspirator which occurred after the termination of a conspiracy may be admitted only to indicate the existence of the conspiracy and not the membership of any co-conspirator who had not been involved in the subsequent act. While the district court's jury instructions might have been improved somewhat, they were in some respects more favorable to the defendant than required. The requirements of the co-conspirator exception to the hearsay rule do not limit the introduction of evidence as to the *acts* of the conspirators, which are not normally considered as hearsay as they are not intended to be means of expression. *Lutwak, supra,* 344 U.S. at 618, 73 S.Ct. 481. Here what was shown were acts and the instruction appears to have been overly favorable at least to defendants Norris and Williamson because the court stated that the evidence as to the aborted heroin sale could not be considered against the other defendants "until they [the jury] believed beyond

a reasonable doubt that a conspiracy had been proved."

██ To the extent that the evidence concerning the aborted heroin sale was hearsay, we point out that the scope of the conspiracy itself, as alleged in the indictment, does not necessarily limit the application of the co-conspirator exception. *See United States v. Mitchell*, 556 F.2d 371, 377 n. 6 (6th Cir. 1977). If it is otherwise proper to apply the exception at all because the existence of a joint venture is relevant to the proof of the crime, it does not matter whether the defendants were in fact charged with conspiracy. *E. g., United States v. Mitchell, supra,* 556 F.2d at 377 n. 6; *United States v. Jones,* 542 F.2d 186, 202 n. 31 (4th Cir. 1976); *United States v. Coppola,* 526 F.2d 764, 770 (10th Cir. 1975); McCormick, Evidence § 267 at 646 (Cleary ed. 1972). *See also Dutton v. Evans,* 400 U.S. 74, 83, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

In any event, the indictment made it clear that the exact dates of the conspiracy were unknown, setting forth as the commencement August 27, 1975, and its conclusion as October 16, 1975.

Affirmed.