Jessie HILLIARD, Appellant,

v.

UNITED STATES, Appellee.

No. 89–CF–923.

District of Columbia Court of Appeals.

Argued Sept. 19, 1991.

Decided March 15, 1994.

Daniel J. Harn, Washington, DC, for appellant.

Kristan Peters–Hamlin, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Asst. U.S. Atty., were on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and WAGNER, Associate Judges.

WAGNER, Associate Judge:

Appellant, Jessie Hilliard, Jr., was found guilty by a jury of: (1) possession of a controlled substance (heroin) with intent to distribute (PWID), D.C.Code § 33–541(a)(1) (1993); carrying a pistol without a license (CPWL), D.C.Code § 22–3204; possession of an unregistered firearm, D.C.Code § 6–2311(a); and unlawful possession of ammunition, D.C.Code § 6–2361(3).[1] Appellant's most substantial argument for reversal is that the trial court erred in denying without an adequate hearing and an *in camera* inspection his request for *Jencks* material.[2] We find no reversible error in the trial court's ruling because the foundational requirements for production or even *in camera* inspection were not met for most of the material, and the error, if any, involving the single form which the trial court found to be *Jencks* was harmless. Appellant also argues for reversal on the grounds that the trial court erred in: (1) denying his motion to suppress tangible evidence; (2) denying his motion for judgment of acquittal on the CPWL count; and (3) admitting other crimes evidence. We affirm.

---

1. Unless otherwise indicated, all Code references are to the 1989 ed.

2. *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

## I.

The government's evidence at the suppression hearing showed that on November 9, 1988, at about 9:00 p.m., Officers James Flynn and Joseph Platt were patrolling the area at 12th and I Streets, S.E. in the Potomac Gardens apartment complex known as the "boardwalk." Officer Flynn described the "boardwalk" as "the open air space between approximately four buildings," which was well known at the time for heroin and cocaine sales. The two experienced narcotics officers saw a man hand a clear packet of white powder to another man and concluded that a drug transaction had occurred. Apparently, having spotted the uniformed officers, people began shouting "olleray," which is pig latin for roller (police), and the man who had just passed the packet fled into apartment 21 at 1212 I Street. The officers pursued the suspect into the apartment where the door appeared to be ajar, allowing the man to enter without turning the knob. Officer Flynn testified that while Officer Platt was frisking the suspect in a hallway inside the apartment, he looked over his shoulder and saw appellant, who was sitting on a bed in one of the bedrooms, trying to hide a blue pouch by tossing it behind him. When appellant reached his hand toward the corner of the bed, Officer Flynn ordered him to stop. Initially ignoring the officer's order, appellant again reached toward the corner of the bed. The officer testified that appellant's movements caused him concern for his safety. Both officers drew their service revolvers and ordered appellant to put his hands in the air.

When appellant stood up, the officers saw the blue pouch, and one of them picked it up, searched it and discovered fifty packets of a substance, later determined to be heroin. One officer searched the area where appellant had lunged and discovered a loaded .45 caliber automatic pistol. Although not in the room with appellant, syringes were strewn throughout the apartment, which the police recovered.

Officer Flynn testified that there were approximately eight people in the apartment, excluding himself, Officer Platt, and the suspect they had chased inside. The officers wrote out PD76 cards ("stop-and-frisk" or "contact" cards) for some of the people, including the suspect, recording the name, address and date of birth of each. Officer Flynn also wrote a description for the suspect they chased inside. The officers arrested only appellant. When arrested, appellant told the officers that he did not live in the apartment, but he came there to rest. When he was booked later, appellant gave an address, but not that of the apartment building where the arrest occurred.

Officer Flynn testified that he had been inside the apartment at least eight other times and that it was a "shooting gallery," i.e., a place where people entered and left at will for the purpose of using drugs. Each time Officer Flynn had been in the apartment, he had seen at least ten, and as many as thirty-three people inside. Although there were a few beds and mattresses in the apartment, the kitchen and bathroom were not in working order. The officer inquired about, but never found the lessee or anyone who knew that person. On prior occasions, the officer recognized some of the people who used the apartment as addicts, and others admitted being there to "shoot up." On those earlier occasions the people would leave hastily when the police arrived. Officer Flynn also testified that there was no clothing there which appeared to belong to appellant.

Although appellant testified at the suppression hearing that he had lived in a room at the apartment since May 1988, he admitted that he had no lease, that he had given pretrial services his mother's address after his arrest, that he had no mailbox key, and that he did not know the names of the other people in the apartment that night. Appellant offered explanations for the absence of such indicia of residence. He also said that the lessee did not live in the apartment, but he paid rent to the lessee's brother.[3]

---

**3.** Appellant's mother testified that her son did not live at her home, and she seemed unsure of the exact address where he lived.

During a *Jencks* inquiry, Officer Flynn testified that the name of the person the officers had pursued into apartment 21 that evening was Ronald C. Scott, and appellant arranged for Scott to testify at the suppression hearing. Mr. Scott testified that on November 9, 1988, he was living in one of the bedrooms at 1212 I Street and that he paid rent to appellant, who was known to him as Hassan. Although Mr. Scott admitted that the apartment was used as a shooting gallery, he said that he and appellant lived there. He testified that syringes were left in the apartment, but he claimed "that type of stuff" was cleaned up. Mr. Scott admitted that he was a heroin addict and that he had used heroin the night of appellant's arrest. He denied that the police pursued him into the apartment that evening.

According to Mr. Scott, he was in his room with two other people, a Ms. Bennett and a Mr. Witherspoon, known as "Spoon." He said he had been watching T.V. for about fifteen minutes, when the police entered his room.[4] Mr. Scott said he never left his room while the officers were in the apartment; therefore, he did not see what went on in appellant's bedroom that night.

The trial court credited the testimony of the police officer. Based upon the conditions of the apartment and the circumstances surrounding its use, the trial court concluded that the apartment was used as a shooting gallery and not as a residence. The court also credited the officer's testimony concerning their observations of a drug transaction which led them to chase the suspect inside the apartment. Therefore, the court upheld the search and seizure of the drugs on the grounds that: (1) the officer properly concluded that no one lived in the apartment nor had a reasonable expectation of privacy there; (2) the police had probable cause to believe the fleeing suspect had committed a crime and could pursue him into the premises; and, (3) the search and seizure of the drugs and guns followed a lawful protective search under *Terry*.[5]

Much of the evidence presented at the suppression hearing was also presented at trial. Officer Flynn again described the apartment in detail and testified that the gun was just twelve inches from appellant when he recovered it. Officer Platt recounted how the officers chased Ronald Scott into the apartment, appellant's action at the time of his arrest, and the purpose for which the apartment was used. Officer Platt testified that he collected only a third of the syringes which were strewn around the apartment. An expert witness in the sale and use of controlled substances testified that the quantity of the heroin and syringes seized was not consistent with personal use.

Ronald Scott testified that he entered the apartment a couple of minutes before the police arrived, but he said the police had chased someone named Wayne inside. Subsequently, Scott said he did not know how the police got into the apartment. Scott admitted that he was a heroin addict, that the apartment was used as a "shooting gallery," and that it was run by appellant to whom he paid rent. Although Scott testified that appellant was asleep with his door closed when the police arrived, on cross-examination, he stated that he could not see what occurred in the bedroom.

## II.

Appellant argues that the trial court erred in denying his request for the production of *Jencks* material at the suppression hearing and at trial. We find no basis for reversal based on the trial court's *Jencks* rulings. The subject of appellant's *Jencks* request were the PD76 cards (contact or "stop and frisk" cards) on which Officer Flynn had recorded the name, address, and description of the fleeing suspect and only the names and addresses of some of the others found in the apartment. The prosecutor argued that the PD76 cards were not *Jencks* material and not otherwise discoverable.

The government was not able to locate the originals of any of the PD76s. During two

---

4. At trial, Mr. Scott testified that he was in his room only *"just a couple minutes"* before police were at his door. Later he stated "ten or fifteen minutes."

5. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1988).

evidentiary hearings concerning the documents, Officer Flynn testified that there was no requirement to fill out PD76 cards, but the supervising officers on the overtime tour used the cards to monitor overtime work. The officer said that he checked the police files for cards prepared for the offense date, but he was unable to locate them. Officer Flynn kept copies of the original cards for his own files which he used for future reference in any subsequent encounters with the individuals. The officer said that he did not write any facts about what occurred in appellant's case on the PD76 cards and that he prepared them hurriedly because of the number of people on the scene. Rather, he said he wrote about the case in the police reports. On the card for Robert Scott, Officer Flynn testified that he wrote only Scott's name, address, date of birth and a physical description, leaving the back of the form blank. The trial court ruled that the PD76 for the suspect the officers chased into the building was producible under *Jencks*, but the court concluded that it made no difference who that person was for purposes of cross-examination. Therefore, the court allowed the government to delete the suspect's name and address. Nevertheless, during cross-examination, defense counsel succeeded in eliciting the suspect's name, address, and date of birth. Once he learned the identity of Mr. Scott, defense counsel subpoenaed him, and the court reopened the suppression hearing to allow Scott to testify.

Defense counsel renewed the request for all PD76s that Officer Flynn had, in part, because Scott had testified that he was not the person pursued that evening, and he wanted to ascertain whether the officers had pursued someone who fit the description of the suspect given by Officer Flynn. The court denied the request as having "absolutely no relationship whatsoever to the material testimony of [Officer Flynn]." The court also denied defense counsel's earlier request that the court inspect copies of all the PD76s *in camera*. The trial court credited the officer's testimony that the PD76 furnished by the government was an authentic copy of the original for Scott; that the officer did not write anything on the back of the card;[6] and, that the other PD76 cards had no information material to the testimony of the witness and would provide no more than unauthorized discovery.

### III.

Appellant argues that the trial court abused its discretion in determining without an adequate hearing, and particularly absent an *in camera* inspection, that all of the PD76 stop and frisk cards were not producible under *Jencks*. It is the government's position that the PD76 cards contained neither statements nor information relevant to the subject of Officer Flynn's testimony, and therefore, the court had no obligation to review the material *in camera* and properly denied disclosure based on the evidentiary record.[7]

■ Under the *Jencks* Act a defendant is entitled to obtain, after the direct testimony of a government witness, prior statements of the witness which relate to the subject matter of the witness' testimony for possible impeachment of the witness. *Fields v. United States*, 368 A.2d 537, 540 (D.C.1977). Only statements, as defined in the Act, which relate to the subject matter of the witness' testimony are producible. 18 U.S.C. § 3500(b) (1970).[8] *See Slye v. United States*,

---

6. The officer had a copy of only the front of the card, and he testified that he had not written on the back of it.

7. The government also contends that the requested material was not producible under *Jencks* because appellant sought it for an impermissible purpose, *i.e.*, solely to ascertain the names and addresses of potential witnesses. *See Oertle v. United States*, 370 F.2d 719, 724–25 (10th Cir. 1966) (witness list unrelated to direct testimony not producible), *cert. denied*, 387 U.S. 943, 87 S.Ct. 2075, 18 L.Ed.2d 1329 (1967). In view of our disposition of the *Jencks* issue on other grounds, we need not address this argument.

8. The statute reads as follows:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the

602 A.2d 135, 138 (D.C.1992). "Statement" is defined in the Act, in pertinent part, as "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e) (1970). Super.Ct.Crim.R. 26.2 implements the *Jencks* Act in the District of Columbia, and it contains essentially the same provisions.[9] *See Washington v. United States*, 499 A.2d 95, 99 (D.C.1985).

■ Appellant argues that all foundational requirements for production of the PD76 cards were met and that the trial court abused its discretion in denying disclosure of the material without an adequate hearing. It is the responsibility of the trial court to determine whether a document contains a "statement" producible under *Jencks*. *Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360–61, 10 L.Ed.2d 501 (1963); *United States v. Jackson*, 430 A.2d 1380, 1385 (D.C.1981); *(George) Matthews v. United States*, 322 A.2d 908, 910 (D.C.1974); *Williams v. United States*, 117 U.S.App.D.C. 206, 208–09, 328 F.2d 178, 180–81 (1963). This court has approved the procedure summarized in *Williams*, for use in determining whether a particular statement is producible. *(George) Matthews*, 322 A.2d at 910. That procedure provides that the trial court:

> conduct such inquiry as may be necessary to determine whether or not the conditions of the statute have been satisfied. [Its]

inquiry may involve an interrogation of witnesses, or [it] may make an in camera examination of the statement, or the circumstances may call for both such in camera examination and interrogation of witnesses.

*Id.* (quoting *Williams*, 117 U.S.App.D.C. at 208–09, 328 F.2d at 180–81 (quoting *Hilliard v. United States*, 115 U.S.App.D.C. 86, 87, 317 F.2d. 150, 151 (1963))). The final decision on production is within the discretion of the trial court, guided by standards set by this court, and subject to limited appellate review. *Campbell*, 373 U.S. at 493, 83 S.Ct. at 1360–61; *Palermo v. United States*, 360 U.S. 343, 353, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959).

■ In light of these principles, we consider first the PD76 cards concerning the individuals other than the fleeing suspect. The trial court determined solely on the basis of testimony that these PD76 cards were not producible. We find no abuse of discretion in the trial court's decision after it made factual findings based upon the officer's testimony. There are circumstances under which the court can determine whether a document is producible under *Jencks* based on testimony alone. *Jackson, supra*, 430 A.2d at 1385; *Williams, supra*, 117 U.S.App.D.C. at 208–09, 328 F.2d at 180–81. This is such a case. The facts established by the officer's testimony leave no doubt that the production of the

> testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
>
> 18 U.S.C. § 3500(b) (1970).

9. Super.Ct.Crim.R. 26.2 provides in pertinent part as follows:

> (a) *Motion for production.* After a witness other than the defendant has testified on direct examination, the Court, on motion of a party who did not call the witness, shall order the prosecutor or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.
>
> \*   \*   \*   \*   \*   \*
>
> (c) *Production of excised statement.* If the other party claims that the statement contains matter that does not relate to the subject matter concerning which the witness has testified,

the Court shall order that it be delivered to the court in camera. Upon inspection, the Court shall excise the portions of the statement that do not relate to the subject matter concerning which the witness has testified, and shall order that the statement, with such material excised, be delivered to the moving party. Any portion of the statement that is withheld from the defendant over the defendant's objection shall be preserved by the prosecutor, and, in the event of a conviction and an appeal by the defendant, shall be made available to the appellate court for the purpose of determining the correctness of the decision to excise the portion of the statement.

> \*   \*   \*   \*   \*   \*
>
> (f) *Definition.* As used in this Rule, a "statement" of a witness means:
> (1) A written statement made by the witness that is signed or otherwise adopted or approved by the witness;
>
> \*   \*   \*   \*   \*   \*

requested material is not compellable under *Jencks* or Super.Ct.Crim.R. 26.2. *See Jackson*, 430 A.2d at 1385. Here the officer's testimony revealed that he hastily wrote nothing about the events in the apartment, and he recorded only the names, addresses, and dates of birth of some of the people present. The officer testified that he wrote no facts about appellant's case on the forms. The trial court, after weighing the credibility of witnesses, may properly credit a police officer's testimony that no statements were recorded. *Sullivan v. United States*, 404 A.2d 153, 157 (D.C.1979).

We have held that "merely random notations of background material such as age, address, place of employment, and the like" are not statements within the meaning of *Jencks*. *Brown v. United States*, 359 A.2d 600, 601 (D.C.1976). On that basis, other police forms, the PD255 (arrest form) and the PD47 (rights card), have been held not to be producible under *Jencks* because they contain no statements within the meaning of the Act. *Childress v. United States*, 381 A.2d 614, 619 n. 5 (D.C.1977). Here, the court is confronted with a *Jencks* challenge to a similar police form which, according to testimony credited by the court, contained only the same type of background information for individuals who were not called as witnesses. On that basis alone, the *Jencks* request was properly denied. *See Brown*, 359 A.2d at 601; *see also Childress*, 381 A.2d at 619 n. 5.

Moreover, the production of the documents is not required unless the statement involved relates to the events about which the witness testified. *United States v. Malcolm*, 331 A.2d 329, 333–34 (D.C.1975); *(Charles) Matthews v. United States*, 407 F.2d 1371, 1374 (5th Cir.1969), *cert. denied*, 398 U.S. 968, 90 S.Ct. 2177, 2178, 26 L.Ed.2d 554 (1970); *United States v. Cardillo*, 316 F.2d 606, 615 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). Statements which are strictly collateral to the subject of the testimony or only peripherally related to it are not producible under *Jencks*. *Brown*, *supra*, 359 A.2d at 601; *United States v. Pacelli*, 491 F.2d 1108, 1120 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d

49 (1974). Here, the trial court credited the officer's testimony that the PD76 cards contained only background information about other individuals who were not involved in the events underlying appellant's arrest. Such information is not considered to be related to the subject matter of appellant's case. *See Malcolm*, 331 A.2d at 331, 334 (affidavits supporting search warrant in cases other than defendant's not *Jencks*, even though alluded to by police witnesses). The trial court credited the officer's testimony that he had written no statements about the events on the PD76 cards. The trial court's factual finding will not be disturbed unless clearly erroneous, and it is not. *Sullivan*, *supra*, 404 A.2d at 156. Based upon its factual finding, it was not error for the court to conclude that no statement under *Jencks* was ever written by Officer Flynn. *See Sullivan*, 404 A.2d at 157. Furthermore, the background information (name, address and date of birth) about the individuals in the apartment is collateral to the subject of the officer's testimony, and therefore, is not *Jencks* material. *Brown*, *supra*, 359 A.2d at 601.

Nevertheless, appellant argues that the *Jencks* Act and Super.Ct.Crim.R. 26.2 require the trial court to order the government to produce for *in camera* inspection any statement it claims is not covered by the Act. Neither the *Jencks* Act nor the implementing Superior Court rule can be read so broadly. One purpose of the *Jencks* Act was to "restrict defendant's right to any general exploration of the government's files." *United States v. Pope*, 574 F.2d 320, 324 (6th Cir.) (*Jencks* Act principally designed to assure *Jencks* decision not misinterpreted to expose government files "to blind fishing expedition"), *cert. denied*, 439 U.S. 868, 99 S.Ct. 195, 58 L.Ed.2d 179 (1978); *United States v. Nickell*, 552 F.2d 684, 688 (6th Cir.1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2233, 56 L.Ed.2d 402 (1978). Accordingly, the *Jencks* Act contains foundational requirements which must be met before production or even *in camera* inspection is required. *Nickell*, 552 F.2d at 690 (refusal to order turnover or judicial screening not abuse of discretion where record shows no foundation laid); *see also Childress*, *supra*, 381 A.2d at 619 n. 5.

Those foundational requirements include that the material constitute a "statement" within the meaning of Super.Ct.Crim.R. 26.2(f) or its·federal counterpart, 18 U.S.C. § 3500(e) and that the statement relate to the subject matter of the witness' direct testimony. *Nickell,* 552 F.2d at 690. These foundational requirements were not met here.

Under the circumstances, the trial court was not required to examine all the PD76 cards, as appellant contends, before determining whether they were producible. If appellant's argument were accepted, testimony by a witness that no statement was written on a particular form would never suffice to resolve the issue. Only the type of unrestricted discovery of documents which the *Jencks* Act was designed to foreclose would be sufficient. *See Nickell, supra,* 552 F.2d at 688. It is not required that the trial court examine all government documents. It is only required that the court have before it a sufficient basis to determine that the statements are not *Jencks. See Oertle, supra* note 7, 370 F.2d at 724–25. Testimony, such as that presented in this case, is an adequate basis upon which to make the foundational determination required here. *See Jackson, supra,* 430 A.2d at 1385.[10]

■ The trial court also ruled that the PD76 card for the suspect chased inside the building was *Jencks* material; however, the court initially ruled at the suppression hearing that the government need not produce the name and address of the suspect. Therefore, the government turned over to the defense a copy of the PD76 with the suspect's name redacted. Appellant argues that the trial court erred in declining to inspect the card *in camera* at the defendant's request and in allowing the government to excise portions of the card. We need not decide whether it was error for the trial court to

decline to examine this particular card before allowing the government to redact the suspect's name because any error in this regard was harmless. The court ultimately ordered the government to disclose the individual's name. The person identified, Ronald Scott, testified at the suppression hearing and at trial that, contrary to the testimony of Officer Flynn, the police did not chase him into the apartment. Therefore, appellant was not prejudiced by the initial nondisclosure of the background information. Even assuming any error, it was harmless. *See Pope, supra,* 574 F.2d at 326–27 (error harmless where no actual prejudice occurs); *United States v. Chitwood,* 457 F.2d 676, 678 (6th Cir.) (reversal for improper *Jencks* ruling not required where defense not prejudiced), *cert. denied,* 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972).[11]

### IV.

Appellant also argues that the trial court erred in denying his motion to suppress tangible evidence. Specifically, appellant argues: (1) that the police intrusion into the apartment did not fall within any exception to the warrant requirement; and, (2) that the police officers lacked reasonable articulable suspicion to detain appellant prior to discovery of the weapon. We disagree.

We consider first the lawfulness of the initial entry by the police into the apartment where appellant was found and arrested. The trial court ruled on two separate grounds that the warrantless entry into the apartment was lawful. We only need to address one of them to affirm the decision. We hold that the trial court properly ruled that the police had probable cause to believe the fleeing suspect had committed a felony, and therefore, could pursue him into the apart-

---

10. *Cf. (George) Matthews, supra,* 322 A.2d at 910 (trial court erred in basing *Jencks* decision on "factually unsupported conclusion of the prosecutor").

11. We reject appellant's argument that the PD76 cards were producible under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) or because appellant was unable to locate the witnesses. The record does not reveal any basis for concluding that the PD76 cards con-

tained exculpatory information which would require production under *Brady.* Appellant did not seek the names and addresses of witnesses under the theories set forth in *United States v. Holmes,* 343 A.2d 272, 276–77 (D.C.) (government may be required to disclose witnesses on "grounds of fundamental fairness and of administrative efficiency and order," balancing the government interest against defendant's need), *reh'g denied,* 346 A.2d 517 (D.C.1975).

ment under what is termed the "hot pursuit" doctrine.

■ The Fourth Amendment prohibits the warrantless and non-consensual entry into a suspect's home for the purpose of effecting a routine felony arrest, absent probable cause and exigent circumstances. *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (1984); *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1374–75, 63 L.Ed.2d 639 (1980); *Derrington v. United States*, 488 A.2d 1314, 1322–23 (D.C.1985), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). Only limited exigencies have been recognized as justification for warrantless searches or arrests. *Welsh*, 466 U.S. at 750, 104 S.Ct. at 2097–98. The hot pursuit of a fleeing felon is one of these recognized emergencies. *Id.* (citing *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976)); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *see also Steagald v. United States*, 451 U.S. 204, 221, 101 S.Ct. 1642, 1652, 68 L.Ed.2d 38 (1981).[12] The continuous pursuit of a suspect from the scene of the crime provides persuasive circumstances for application of the "hot pursuit" doctrine. *See Welsh*, 466 U.S. at 753, 104 S.Ct. at 2099. Under such circumstances, the suspect may not evade arrest by simply retreating to a private dwelling. *Santana*, 427 U.S. at 43, 96 S.Ct. at 2410; *Edwards v. United States*, 379 A.2d 976, 979 (D.C.1977); *see also People v. Rivera*, 233 Ill.App.3d 69, 174 Ill.Dec. 226, 229–30, 598 N.E.2d 423, 426–27 (1992).

■ Here, the experienced narcotics officers were in a known narcotics area when they observed the suspect transfer a plastic packet containing a white powdery substance which, based on their experience, they believed to be drugs. As soon as someone called out the alert that the uniformed officers were present, the suspect ran into an apartment which the officers knew to be used as a "shooting gallery," and the officers followed. These circumstances were sufficient to provide probable cause for the officers to believe that the suspect distributed drugs, a felony in this jurisdiction.[13] Therefore, the officers' warrantless entry into the apartment where appellant was arrested was lawful under the "hot pursuit" doctrine. *Santana, supra*, 427 U.S. at 43, 96 S.Ct. at 2410; *Edwards, supra*, 379 A.2d at 979.

■ We consider next appellant's argument that the officers lacked reasonable articulable suspicion to detain him and search the area around him from which they seized the weapon and drugs. The police may conduct a limited protective search in hot pursuit situations. *Warden, supra*, 387 U.S. at 299, 87 S.Ct. at 1646; *Ruth v. United States*, 438 A.2d 1256, 1260 (D.C.1981). While the officers were engaged in frisking the suspect, appellant reached twice for something in spite of the officer's warnings to stop. Appellant's suspicious actions caused the officers to fear for their safety. Apprehending danger, the officers checked the place where appellant was reaching for weapons. Under the circumstances, they were entitled to conduct a protective, limited search. *Ruth*, 438 A.2d at 1260; *see also Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981); *Peay v. United States*, 597 A.2d 1318, 1322 (D.C.1991) (en banc). Therefore, the police were justified in taking actions to assure their safety which led to recovery of the weapon from the area where appellant had been reaching.

■ Appellant challenges generally as a Fourth Amendment violation the seizure of all evidence, which necessarily includes the

---

12. In *Welsh* the Supreme Court also refers to cases involving other recognized exigencies. 466 U.S. at 750–751, 104 S.Ct. at 2098–2099. (citing *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (destruction of evidence)); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978) (ongoing fire). However, the Court observed that it had "actually applied only the 'hot pursuit' doctrine to arrests in the home." *Welsh*, 466 U.S. at 750, 104 S.Ct. at 2097–98; *see*

*Santana, supra*, 427 U.S. at 42–43, 96 S.Ct. at 2409–10; *see also United States v. Socey*, 269 U.S.App.D.C. 453, 458–59, 846 F.2d 1439, 1444–45 (outlining limited emergency situations excusing warrant requirement), *cert. denied*, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); *United States v. Johnson*, 256 U.S.App.D.C. 65, 68, 802 F.2d 1459, 1462 (1986).

13. *See* D.C.Code § 33–541(a)(1).

pouch containing the drugs. The government argues that, assuming the officer's search of the pouch was premature, it was lawful under the inevitable discovery doctrine. Under that principle, evidence seized as a result of an illegal search will not be suppressed if it would have been discovered inevitably incident to a lawful arrest. *United States v. Lewis,* 486 A.2d 729, 735 (D.C.1985); *District of Columbia v. M.M.,* 407 A.2d 698, 702 (D.C.1979). The facts of this case fall within the parameters of the rule. Appellant's arrest based on discovery of the weapon was certain, and the officer recovered the weapon almost simultaneously with the recovery and search of the pouch. Since there was the "requisite 'actuality' of an inevitable discovery of the [drugs] by [a] search incident to [appellant's] arrest," we find no error in the trial court's ruling denying the motion to suppress. *See M.M.,* 407 A.2d at 702.

## V.

■ Appellant also argues that the trial court erred in denying his motion for judgment of acquittal. This argument is based on the claim that the evidence at trial placed defendant within the "dwelling house" exception to D.C.Code § 22–3204. A defendant's motion for judgment of acquittal must be granted if "the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." *Curry v. United States,* 520 A.2d 255, 263 (D.C. 1987) (citation omitted). Viewed against that standard, we find no error. Although appellant presented evidence that the apartment where he was arrested was his home, there was substantial evidence from which the jury could justifiably infer that appellant did not live in the apartment. Officer Flynn provided a detailed description of the apartment, including its use as a shooting gallery and its condition consistent with that purpose. Appellant's own witness admitted that the apartment was used as a shooting gallery. The evidence was sufficient, with permissible

inferences, to justify the jury in finding that the apartment was not appellant's home or exclusively controlled or possessed by him and in finding appellant guilty of CPWL beyond a reasonable doubt.[14] *See id.*

## VI.

■ Finally, appellant argues for reversal on the ground that the trial court admitted "other crimes" evidence (the syringes) during the government's case-in-chief. Generally, evidence of other crimes is not admissible except under limited exceptions. *See Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964). Other crimes evidence is admissible "when relevant to explain the immediate circumstances surrounding the offense charged." *Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983); *accord, Lewis v. United States,* 379 A.2d 1168, 1170–71 (D.C.1977) (narcotics paraphernalia admissible to explain surrounding circumstances of the charged offense of heroin possession).

The government relies upon *Lewis* in support of its argument that the trial court properly admitted the evidence. In *Lewis* this court upheld a decision admitting into evidence drug paraphernalia, a bottle cap "cooker" and syringe, in a prosecution for possession of heroin. 379 A.2d at 1170. We held that "[p]ossession of these items is relevant to a prosecution for possession of heroin, and aided in explaining the circumstances surrounding the offense for which appellants were charged." *Id.* Similarly, in *Toliver,* this court upheld the admission of evidence of what appeared to be six drug transactions in the prosecution of a defendant for a single count of possession of heroin. 468 A.2d at 959–60. We concluded that such evidence is not other crimes evidence. *Id.* at 960. Significantly, in *Toliver,* we observed:

> "Evidence of 'an uncharged offense arising out of the same transaction or series of transactions as the charged offense is not an extrinsic offense within the meaning of [other crimes evidence].'"

---

14. The trial court instructed the jury that the government had the burden of proving beyond a reasonable doubt that defendant was not carry-

ing the pistol in his home, place of business, or on other premises exclusively in his control or possession. *See* D.C.Code § 22–3204.

*Id.* at 960–61 (quoting *United States v. Brooks*, 670 F.2d 625, 628–29 (5th Cir.1982)) (other citations omitted).

We perceive no difference between the circumstances in *Lewis* and *Toliver* and those presented in this case which would compel a different result. In the instant case, the evidence of the nature of the premises, shown in part by the many syringes scattered throughout the apartment, placed in context the circumstances surrounding the charged offenses. *See Toliver, supra,* 468 A.2d at 961. The government was not required to sanitize what its witnesses saw when they observed appellant engaged in criminal conduct for which he was charged. *See id.* The evidence explained not only the circumstances surrounding the drug distribution charge, but also the nature of the premises where appellant possessed the pistol.[15] Therefore, we hold that the trial court did not abuse its discretion in admitting the evidence.[16]

For the foregoing reasons, the judgments of conviction appealed from hereby are

*Affirmed.*

15. Where there is some evidence that a defendant carried a pistol in his home, the government must prove beyond a reasonable doubt that the defendant was not carrying the weapon in his home. *See* D.C.Code § 22–3204; Standard Criminal Jury Instructions for the District of Columbia, No. 4.81 (1978 ed.)

16. On the particular facts of this case, we reject appellant's argument that the evidence was inadmissible because the syringes were not shown to belong to him or to come from the room where he was located or that their prejudicial effect outweighed their probative value. Further, in view of our disposition of the evidentiary issue, we have no occasion to consider whether the trial court erred in relying on the intent exception in *Drew,* in admitting the evidence. *See Toliver, supra,* 468 A.2d at 961.