**Vicente LAZO, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 09–CM–653.

District of Columbia Court of Appeals.

Argued Jan. 13, 2011.

Decided Oct. 11, 2012.

---

Moses Cook, D.C. Law Students in Court, with whom Jennifer P. Lyman, D.C. Law Students in Court, Washington, and Courtney Enlow, Student Counsel, were on the brief, for appellant.

Anne Y. Park, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Elizabeth Trosman, Mary B. McCord, and Lindsay J. Suttenberg, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY, Associate Judge, and KING and RUIZ *, Senior Judges.

RUIZ, Senior Judge:

Vicente Lazo was convicted of one count of misdemeanor sexual abuse, in violation of D.C.Code § 22–3006 (2001). He makes three arguments on appeal: (1) that the charging document lacked particularity about the date and time of the alleged offense, and thus did not provide adequate notice to appellant of the charges against him; (2) that the trial court abused its discretion in failing to independently inquire about potential Jencks Act material; and (3) that the evidence was insufficient to support his conviction. For the reasons that follow, we conclude that the trial court did not abuse discretion in denying the motion to dismiss the Information and that the evidence was sufficient to convict appellant of the sexual charge. However, we remand the case for an evidentiary hearing and fact findings into the possible existence of undisclosed Jencks material of statements made by the complaining witness and her mother. If the court determines that the government should have been required to disclose Jencks material to the defense, and appellant was prejudiced as a result, the conviction should be vacated and appellant accorded a new trial.

## I. Factual and Procedural Background

G.F., who was nine years old at the time of trial, was the government's principal witness against appellant, whom G.F. knew as Uncle Chente. G.F. testified that on one afternoon of an unspecified day when she was eight years old and in the second grade,[1] she was watching television and playing card games with her sister and cousins in appellant's apartment while appellant was in the next door apartment of G.F.'s aunt, Telma Lazo ("Aunt Telma"). Appellant is Aunt Telma's brother-in-law. At the time G.F. and her family were living with Aunt Telma and her family. There were no other adults in either apartment. G.F. testified that she went into Aunt Telma's apartment to retrieve a deck of cards from her aunt's bed that she had left there and heard someone eating in the kitchen. As she was leaning on the bed to get the cards, G.F. said, "somebody jumped behind me and touched me in an inappropriate way."[2] G.F. specified that it was appellant, and that he "push[ed] [her] towards the bed" with his pelvis, spread her legs apart, squeezed her buttocks, and "rubbed" her right breast over her clothes. She testified that appellant was also attempting to get his hand "inside [her] shirt." G.F. kicked backward to get appellant off of her and he warned her, in Spanish, "Don't tell nobody or I'll hurt you." G.F. then returned to appellant's apartment to be with her sister and cousins. Upset and crying, she told them what had happened in Aunt Telma's apartment. G.F. also told Aunt Telma about the encounter when she returned home later that day. G.F. did not tell her mother about the incident at that time because she was afraid appellant would hurt her. Eventu-

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

1. At trial, there was some confusion as to G.F.'s age at the time of the incident. It was established, however, that she was born on December 21, 1999, which would mean she was eight years old in the fall of 2008.

2. In response to a question from the judge, the prosecutor said during closing argument that it was "the language of someone who interviewed her ... [it] doesn't sound like a nine-year-old girl's language."

ally, she decided "[t]hat [she] needed to stop being afraid of people," and she told her mother. G.F. could not recall whether it has been "days, weeks, months, [or] years" until she mustered the courage to tell her mother.

G.F. could not remember when the encounter occurred, and could not recall if the incident happened when she was in school or during the summer. G.F. did remember that her mother was working at a gas station at the time of the incident; her mother later testified that she worked at a gas station from November of 2007 to July 13, 2008. The prosecutor argued that the abuse occurred during the two months that G.F. lived in her aunt's apartment, from August to September 2008.

G.F.'s mother, Josephine Roa, testified that G.F. told her about the encounter with appellant on September 18, 2008, the day of her granddaughter's birthday. Roa stated that G.F. was "crying" and "very upset," but that she did not take G.F. to a doctor after learning of the assault. Roa also testified that she wrote down a statement of what her daughter told her and gave it to a social worker the school had called.

At the close of the government's evidence, defense counsel moved for a judgment of acquittal, arguing "that the government has not proven beyond a reasonable doubt that the alleged abuse occurred reasonably close to the dates within the [I]nformation," from March 20 to September 16, 2008.

The defense focused on the credibility of G.F., in particular, her inability to recall the date and details of the encounter and inconsistencies in the accounts she gave to different people. Counsel also questioned G.F. about a prior inconsistent statement she had made at the Children's Advocacy Center where she claimed appellant had touched her on the chest.[3] The defense called four witnesses to point out inconsistencies in G.F.'s account. First, twelve-year-old M.F. confirmed that her sister, G.F., told her that appellant had touched her inappropriately on her chest and "private stuff." She also testified, however, that the assault occurred at Aunt Telma's apartment "a long time ago" and that she did not remember G.F.'s age at the time of the incident. M.F. did recall that G.F. told their mother about the incident two days after they started school at Truesdell Elementary. Second, the defense called G.F.'s cousin, twelve-year-old M.L., who testified that G.F. told her about the incident about "five years" before trial, when M.L. was seven years old. She also said that G.F. was not living with her at Aunt Telma's apartment at the time of the incident. Third, the defense called Aunt Telma, who testified that G.F. and her family lived in her apartment "around September," before she left to go to El Salvador

3. Prior to trial, the court had granted appellant's motion to compel evidence from the government of a videotape of G.F. speaking with a social worker at the Children's Advocacy Center, but denied appellant's request at the close of the defense case to play for the jury three of G.F.'s statements from the videotape to impeach G.F. and M.F. (G.F.'s sister). Defense counsel argued that the government had had the opportunity to ask the witnesses "about what was on the tape" during its examination of the witnesses "if they disagreed with my characterization" during defense counsel's examination of the witness. The trial court reasoned that the videotape was not entered "at an appropriate time for impeachment" when the witnesses were testifying, and the government needed to have "had an opportunity ... to have that witness explain why that statement may have been consistent with the prior statement...." Although appellant appears to complain about this and other limitations imposed by the trial judge, he does not challenge the trial court's ruling on appeal.

on October 1, 2008. Aunt Telma also recounted for the court an incident that occurred "four or five years ago" in which G.F. and M.L. were fighting on a bed and appellant pushed G.F. off the bed to break up the fight. Lastly, the defense called Metropolitan Police Department (MPD) Detective Maria Flores, who testified that G.F. had told her that appellant had touched her under—not over—her shirt. The defense presented evidence that G.F. was motivated to fabricate the allegation of abuse against appellant. At the time of the incident, G.F. lived with fourteen people, including her mother, brothers, and sisters, in a one-bedroom apartment with her Aunt Telma's family. G.F. testified that she did not like living in the apartment because the family "w[as] too squished in there." Aunt Telma testified that she once overheard G.F. tell M.L., "[T]his is the way you use your brain when your mom and your dad doesn't [sic] have any place to live, you … think about it and do something about it and try to take someone out of the apartment," or "try to help your mom where she can get an apartment."

The defense renewed its motion for judgment of acquittal, which the trial court denied. During closing arguments, both parties focused on whether the government had established beyond a reasonable doubt that the offenses occurred on a date reasonably near the dates—between March 20 and September 16, 2008—alleged in the Information. The trial court reserved ruling until the following day, and allowed both parties to submit briefs on the issue in light of this court's decision in *In re E.H.*, 967 A.2d 1270 (D.C.2009).[4]

The trial court found that the incident had "occurred between August and September 2008," based on his belief that G.F. was living with her Aunt Telma at the time and had told her mother "that it occurred approximately two days before school began whe[n] she would enter Truesd[ell] Elementary."[5] The trial court found appellant guilty of two counts of sexual abuse, merged the two counts, and sentenced appellant to 180 days of incarceration, execution of the sentence suspended, two years of supervised probation, and ordered appellant to pay a $100 fine to the Victims of Violent Crime Compensation Fund. The court also ordered appellant to stay away from G.F., prohibited his unsupervised contact with minor children (including his own children), and required appellant to register as a Class B sex offender.[6] Appellant filed a timely notice of appeal.

## II. Sufficiency of the Information

The Information against appellant charged him with two counts of engaging in sexual contact with G.F. "[b]etween on or about March 20, 2008, and September 16, 2008." Appellant contends that the Information failed to provide adequate notice of the charges against him in that it lacked particularity about the date and

---

4. We discuss *In re E.H., infra.*

5. Although the trial judge found that G.F. had told her mother that the incident occurred "approximately two days before school began whe[n] she would enter Truesd[ell] Elementary," this fact was not in evidence. In their brief, appellants point out that G.F. never testified that she told her mother that the incident occurred two days before she had started Truesdell Elementary School; rather

it was M.F. who testified that G.F. had told their mother at that time, not that the abuse occurred then. The government argues that even if M.F.'s testimony was ambiguous on this point, there was other "ample evidence to demonstrate that appellant inappropriately touched G.F. on her buttocks and on her breasts in August or September 2008."

6. D.C.Code § 24–1101 (2000 Supp.).

time of the alleged offense. The government asserts that appellant waived this claim by failing to raise the issue within ten days of arraignment,[7] *see* Super. Ct. Crim. R. 47–I, and that, in any event, appellant was not prejudiced by the lack of greater specificity in the Information.

■■■ "An indictment or other charging document must assert a plain and concise statement of an alleged offense sufficient to put the accused on notice of the nature of the offense charged." *Patterson v. United States*, 575 A.2d 305, 305 (D.C. 1990) (per curiam). We have adopted a two-part test for determining whether an indictment or information is overly broad: "[ (1) ] whether [the indictment or information] gives the defendant adequate notice of the charges against him so that he can prepare a defense[;] and [ (2) ] whether, if he is later charged with a similar offense, he may successfully assert a claim of double jeopardy." *Olafisoye v. United States*, 857 A.2d 1078, 1086 (D.C.2004).[8] If this standard is met, it is not material that the indictment could have been made more

definite or certain. *See Pearsall v. United States*, 812 A.2d 953, 960 (D.C.2002). "[I]n the absence of demonstrable prejudice, we may not reverse." *Craig v. United States*, 490 A.2d 1173, 1176 (D.C.1985).

■■■ The charging document here, though far from specific, was not overly broad under the circumstances. Appellant does not dispute that the Information provided adequate notice of the offenses with which he was charged, and the nature of the alleged conduct he would have to defend at trial.[9] At the pre-trial hearing, the prosecutor added the exact location where the sexual conduct allegedly took place, 710 Jefferson Street, N.W. The question is whether the six-month range that the Information identifies as the time during which the incident occurred was overly broad. "Good pleading undoubtedly requires an allegation that the offense was committed on a particular day ... but it does not necessarily follow that the omission to state a particular day is fatal." *Olafisoye*, 857 A.2d at 1086. In cases in-

7. We do not consider that appellant has waived the issue. Before trial, the prosecutor sent a package of discovery materials to the defense, and made a demand for any anticipated alibi defense. *See* Super. Ct.Crim. R. 12.1. In response, appellant filed a *Rosser* letter requesting a Bill of Particulars, contending that because of "the long span of time" in the Information, "it is impossible for [appellant] and his counsel to prepare for trial and adequately defend against the charges." The government opposed the request on the ground that in light of the "extensive discovery" that had been supplied provided adequate notice. Appellant then filed a motion with the court to compel the government to provide a Bill of Particulars, which the trial court denied at a pre-trial hearing. Defense counsel moved to dismiss the Information for "lack of specificity" as to when the charged offenses occurred. The trial court denied the motion on the merits, not on the grounds of waiver.

8. In the case of an indictment, a third requirement is that the charges be sufficiently specific that jeopardy at trial is limited "to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Roberts v. United States*, 752 A.2d 583, 587 (D.C.2000) (quoting *Russell v. United States*, 369 U.S. 749, 771, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)).

9. In this jurisdiction, misdemeanor sexual abuse contains two essential elements: "(1) that the defendant committed a 'sexual act' or 'sexual contact' ... and (2) that the defendant knew or should have known that he or she did not have the complainant's permission to engage in the sexual act or sexual contact." *Harkins v. United States*, 810 A.2d 895, 900 (D.C.2002). Both counts of the Information contained each element, and thus appellant was made aware of the issues that would be adjudged at trial. The offense date is not an essential element of the charge. *See Roberts*, 752 A.2d at 589.

volving children similar to the one before us, we have "tolerated some generality as to dates so long as the defendant has not suffered substantial prejudice" because "[a] young victim of rape or sexual molestation often cannot be expected to recall exact dates and times." *Roberts*, 752 A.2d at 589. Here as well, we tolerate a certain amount of imprecision as to the date of the offense in light of G.F.'s young age, the threats she said appellant made to her, and the traumatic nature of the experience, all of which may have contributed to her difficulty in recollecting the precise date of the abuse. We recognize that the cases we have decided to date have involved multiple or continuing offenses,[10] whereas here, appellant was charged with two offenses that were part of a single incident on one day. There may be cases, even involving children, in which a six-month time frame in an information or indictment charging a single instance of abuse cannot stand because it will not suffice to permit a defendant and counsel to investigate and formulate a defense. But this is not such a case. Appellant knew the complaining witness and the other witnesses in the case and was familiar with the location where the offense was alleged to have occurred. Moreover, we see no substantial prejudice to appellant caused by the six-month date range in the Information because appellant's theory of

defense was a general denial of the allegations,[11] rather than a more specific defense centered on a precise offense date.[12] *Cf. Roberts*, 752 A.2d at 587 (recognizing that a defendant may face difficulty in preparing an alibi defense "where the date of the alleged wrongdoing has not been identified"). Thus, we think appellant had fair notice of the charges against him, even if he was not informed of the specific date when the offense was alleged to have occurred. Therefore, "[wi]th regard to the purpose [of an information] of informing an accused of what he must be prepared to meet," appellant "could not have been misled in any meaningful way" by the six-month date range. *See Nichols v. United States*, 343 A.2d 336, 344 (D.C.1975).

Further, appellant faces no significant risk of double jeopardy caused by the six-month date range in the Information. If appellant were charged again with the same type of offense, he would have at his disposal a well-developed evidentiary record, two days of trial testimony, and the factual findings by the trial court that the specific acts of sexual abuse of which he was convicted in this case took place between August and September 2008. This record, we are confident, is "sufficiently detailed to preclude a second prosecution for the same offense." *Craig*, 490 A.2d at 1177; *see Nichols*, 343 A.2d at 343 ("In the

---

10. *See, e.g., Olafisoye*, 857 A.2d at 1086 (upholding information charging four incidents of misdemeanor sexual abuse that occurred "between May 22 and June 19, 2000, and again between July 1 and July 31, 2000"); *Roberts*, 752 A.2d at 585–87 (upholding indictment that was interpreted to allege a series of criminal acts with teenager over a period of months); *Jackson v. United States*, 503 A.2d 1225, 1226 (D.C.1986) (upholding indictment charging seven separate incidents involving three children aged seven, eight and twelve, in four different time frames of one to nine months, all within an eighteen-month period).

11. In closing, defense counsel argued that G.F. had fabricated the allegation of sexual abuse in order to evict appellant from his apartment because she felt Aunt Telma's apartment, where she and her family lived, was too crowded with family members.

12. Appellant has not suggested, for example, that he could have presented evidence that he was not living in the apartment next to G.F. or was out of town at any time during the six-month period, or more to the point, during August to September 2008, when the trial court found that the abuse took place.

unlikely event that [appellant] were charged again with the same crimes, the entire record would be available to [him] to show the offenses here.").

Because "an indictment which adequately protects these interests of fair notice of the charges and avoidance of future prosecutions will not be dismissed," *Pearsall,* 812 A.2d at 961, we conclude that the six-month date range in the Information does not warrant reversal of appellant's convictions.

### III. Sufficiency of the Evidence

■■■ Appellant argues that the government failed to produce any evidence from which a reasonable fact-finder could have concluded beyond a reasonable doubt that he assaulted G.F. during the six-month period alleged in the Information. "[W]hen an indictment charges that the offense occurred 'on or about' a certain date, as it did here, a defendant is on notice that a particular date is not critical." *Jones v. United States,* 716 A.2d 160, 166 (D.C.1998). Therefore, "[t]he evidence will conform to the indictment ... if it establishes that the offense was committed on a date reasonably close to the one alleged." *Id.* Here, the Information alleged that the offense occurred "[b]etween on or about March 20, 2008 and September 16, 2008."

■■■ Our standard of review in a challenge to the sufficiency of the evidence is well-settled. "We view the evidence in the light most favorable to the government, recognizing the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony." *Dickerson v. United States,* 650 A.2d 680, 683 (D.C.1994). We will reverse a conviction for insufficiency of the evidence only if the government has produced "no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt."

*Anderson v. United States,* 857 A.2d 451, 463 (D.C.2004); *see Rivas v. United States,* 783 A.2d 125, 134 (D.C.2001) (en banc) ("A court must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' ") (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

■■■ There is no denying that at trial, there was conflicting and inconsistent testimony about precisely when the assault occurred. The court heard testimony from G.F. that the assault occurred while her family lived in Aunt Telma's apartment, and that her mother was working at a gas station at the time. Aunt Telma testified that G.F.'s family lived with her in September 2008. However, G.F.'s mother testified that she worked at a gas station from November 2007 to July 13, 2008. She also testified that G.F. reported the incident to her sometime around September 18, 2008, "like a week and a half before school [began] or somewhere around there." G.F.'s sister, M.F., on the other hand, testified that G.F. told her mother about the encounter "two days" before they began at Truesdell Elementary School. M.F. also said that the assault occurred "a long time ago," as did G.F.'s cousin, M.L., who testified that G.F. told her about the assault about five years earlier and that G.F. did not live in her apartment at the time of the assault.

In his brief, appellant relies upon our decision in *In re E.H.,* 967 A.2d 1270 (D.C. 2009), for the proposition that there was insufficient evidence to convict appellant in this case because "the fact-finder would have had to speculate that ... [the crime occurred] 'on or about' " the dates alleged in the Information. *In re E.H.* is distinguishable from this case because in *E.H.*

the indictment charged a specific "sexual act"—anal penetration—that occurred "on or about January 29, 2005." 967 A.2d at 1273–1274. The child victim and his mother testified, however, that "there was no 'sexual act'" on that date, but that "*some type of sexual abuse occurred at some unspecified time.*" *Id.* at 1274. Thus, we held that "there [wa]s no evidence with the specificity necessary to allow a fact-finder to conclude, beyond a reasonable doubt, that E.H. was responsible for engaging in a sexual act ... that occurred on a date 'reasonably close to the one alleged.'" *Id.* at 1275 (quoting *Ingram v. United States,* 592 A.2d 992, 1007 (D.C.1991)). Unlike in *E.H.,* in this case, although the evidence was confusing, and the witnesses inconsistent, depending on the trial court's credibility determinations, the evidence was sufficient to support that the specific acts of sexual abuse detailed in the Information occurred during the six-month period noted in the Information.

Conflicting trial testimony is, of course, nothing new and it is the duty of the finder of fact to reconcile such inconsistencies. *See, e.g., Koonce v. United States,* 993 A.2d 544, 551 (D.C.2010) ("[C]ontradictions among witnesses at trial are inevitable and are matters for the jury to resolve as they weigh all the evidence."). In this case, the trial court, as the finder of fact, resolved the conflicting evidence as follows:

> Now, Ms. [Telma] Lazo testified that [G.F.] was living with them between August and September 2008, and [G.F.] told her mother what had happened on September 18th, on or about September 18, 2008, and told her that it had occurred approximately two days before school began where she would enter Truesd[ell] Elementary. As I indicated, [G.F.] told her sister the same day that it occurred. The Court finds that this offense occurred between August and September 2008.

■■■■■ In reviewing a conviction in a bench trial, we "will not reverse unless an appellant has established that the trial court's factual findings are 'plainly wrong' or 'without evidence to support [them].'" *Mihas v. United States,* 618 A.2d 197, 200 (D.C.1992). "We 'will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion.'" *Shepherd v. United States,* 905 A.2d 260, 262 (D.C.2006) (quoting *In re S.G.,* 581 A.2d 771, 775 (D.C.1990)). Although we cannot say that the trial court's findings of when the abuse took place are "plainly wrong," or "without evidence to support them," we do note that the trial court relied on what appears to have been a misrecollection of the evidence presented at trial. G.F. did not testify—as the trial court believed—that she told her mother the sexual abuse occurred two days before she started school. Rather, G.F.'s mother testified that G.F. had told her about the incident a week and a half before school started; but G.F. testified that it took her some time—she could not say how long—before she told her mother. This misrecollection is not necessarily fatal to the trial court's ultimate finding of guilt, but it is not our role to reweigh the evidence on appeal. That is the trial court's responsibility. "In a bench trial, ... the trial court will often reveal the precise basis for the decision. We think that if that particular basis is erroneous but other bases not addressed by the trial court would sustain a conviction, the proper course of action is to remand rather than reverse outright." *Foster v. United States,* 699 A.2d 1113, 1116–17 n. 5 (D.C.1997). "Therefore, 'we are constrained to remand this case for the court to weigh the evidence in the record afresh, and render a new verdict.'" *Grayson v. United States,* 953 A.2d 327, 328 (D.C.2008) (quoting *Shewarega v. Yegzaw,*

947 A.2d 47, 54 (D.C.2008)); *see In re C.J.,* 514 A.2d 460, 463–64 (D.C.1986) (reversing judgment in a bench trial, although there was sufficient evidence to support the verdict, because the "trial judge's findings contain factual statements that are unsupported by the record," and "the possibility exists that in finding guilt, the trier of fact was swayed by erroneous factual matter").

## IV. Jencks Act [13] Violations

We also remand the case for further inquiry and fact finding concerning statements made by the witnesses presented in the government's case-in-chief that, it appears from the record, might have been recorded by government agents. Appellant argues that the trial court erred "on at least four separate occasions, by failing to order production of witness statements that the government was required by the Jencks Act to turn over to the defense, or at least to conduct an independent inquiry into their existence." The government responds that the court did not abuse its discretion in declining to conduct an independent investigation into the existence of Jencks material, and that, in any event, any error is harmless.

 The Jencks Act is "a limited statutory scheme which serves the concurrent purposes of aiding the search for truth by facilitating the impeachment of a witness who has given a statement to the government, while at the same time regulating access by the defense to materials and evidence within the government's possession." *Frye v. United States,* 600 A.2d

808, 810 (D.C.1991). Four prerequisites must be met before the government will be required to turn over Jencks material: "[ (1) ] 'The material must be in the possession of the government; [ (2) ] the defense must request the material; [ (3) ] the material must constitute a 'statement' as defined [in the Jencks Act]; and [ (4) ] the statement must relate to the subject matter of the witness' direct testimony.' " *Lyles v. United States,* 879 A.2d 979, 983 n. 12 (D.C.2005) (quoting *Butler v. United States,* 481 A.2d 431, 446 (D.C.1984) (fourth alteration in original)). "The administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts.' " *Id.* at 982 (quoting *United States v. Augenblick,* 393 U.S. 348, 355, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969)). We have therefore afforded trial courts "considerable deference in ruling on Jencks Act issues," which we review for abuse of discretion. *Johnson v. United States,* 800 A.2d 696, 699 (D.C.2002); *see (Jessie) Hilliard v. United States,* 638 A.2d 698, 703 (D.C.1994) ("The final decision on production is within the discretion of the trial court ... and subject to limited appellate review."). Before we will defer to the trial court's ultimate ruling on production, however, the court must conduct a proper inquiry and make relevant findings.

 Thus, "[i]t is the responsibility of the trial court to determine whether a

---

**13.** The Jencks statute provides:

After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b) (2006). In the District of Columbia, Superior Court Criminal Rule 26.2 implements the Jencks Act. *See* Super. Ct. R.Crim. 26.2; *see also Lyles v. United States,* 879 A.2d 979, 983 (D.C.2005); *(Jessie) Hilliard v. United States,* 638 A.2d 698, 703 (D.C. 1994).

document contains a 'statement' [14] producible under Jencks." *(Jessie) Hilliard,* 638 A.2d at 703. "Once a defendant requests production of reports or statements under the Jencks Act, ... the trial court 'has an affirmative duty, either by interrogation or by *in camera* inspection, to ascertain whether the statement is one defined by the Act itself as producible material and whether it is in the possession of the government.' " *Bayer v. United States,* 651 A.2d 308, 311 (D.C.1994) (quoting *Colbert v. United States,* 471 A.2d 258, 262 (D.C. 1984)). This case raises a preliminary question: when must the trial court make such a determination? The evidentiary proffer that triggers the court's duty to inquire is not onerous:

> The burden on the moving defendant is not to prove the existence of a statutory "statement." The purpose of the collateral proceeding is to resolve that issue. Rather, the burden is simply to establish by probative evidence usually on cross-examination of the witness alleged to have given a statement that there is reason to believe that a statutory "statement" may exist. Certainly more must be shown than a speculative possibility.

*Goldberg v. United States,* 425 U.S. 94, 124, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976) (Powell, J., concurring). To establish entitlement to an inquiry by the trial court, we have said, "counsel need elicit only that the witness was interviewed by an agent of the government, who made notes of he conversation." *Johnson,* 800 A.2d at 700 (holding that complaining witness's testimony that

police officer took notes during interview with the complainant sufficed as prima facie evidence of Jencks material); *see Flores v. United States,* 698 A.2d 474, 481 (D.C.1997) ("[T]he trial court has an affirmative duty to conduct an independent inquiry into the existence of Jencks material once a witness testifies that an officer took notes of a statement."). It is only after the court has made the necessary factual determinations that it can decide whether disclosure is required.

Here, appellant claims that the trial failed, in four instances, to conduct the proper inquiry. We consider each one separately.

### 1. Notes from G.F.'s Interview with Second Police Officer.

 Appellant's trial counsel began cross-examination of G.F. by eliciting that she was interviewed by police officers about the sexual abuse. G.F. testified that she spoke to two police officers, at two different times, and that both made notes of her statement. G.F. testified that the first officer, a woman, had blond hair and was wearing a suit,[15] but could not remember the appearance of the second officer. The following exchange occurred:

> **Defense Counsel:** Now, that other officer, the one you couldn't remember exactly what they looked like, were they writing stuff down while you talked to them?
>
> **G.F.:** Yes.

---

**14.** The Jencks Act defines a "statement" as "(1) a written statement made by said witness and signed or otherwise adopted or approved by him[;] (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement[;] [or]

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 18 U.S.C. § 3500(e).

**15.** Appellant does not dispute that Jencks material from the first officer, Detective Flores, was properly provided to the defense.

**Defense Counsel:** Okay. Did they have a—like a pen or pencil[,] do you remember?

**G.F.:** They had a pen.

**Defense Counsel:** And did they have like a notebook or pad or piece of paper? What were they writing on?

**G.F.:** They were writing on the notebook.

**Defense Counsel:** And did they ask you to repeat anything?

**G.F.:** Yes.

**Defense Counsel:** Did they ever ask you to slow down so they could write better?

**G.F.:** Yes.

Defense counsel then inquired of G.F. whether the prosecutor, Assistant U.S. Attorney (AUSA) Suttenberg, had talked to her about the case. G.F. responded affirmatively and also said that AUSA Suttenberg had taken notes during their conversation. As defense counsel attempted to ask additional questions concerning G.F.'s meetings with the second police officer and AUSA Suttenberg, the trial judge interrupted, saying, "I think we've gone through whether or not there's any Jencks material. I think Ms. Suttenberg had indicated there's no[ ] Jencks." Defense counsel then alerted the court that Jencks material for the second police officer may exist, but had not been turned over to the defense, and that the court was required to conduct an independent inquiry into its existence. The court asked the prosecutor whether she had any Jencks material from the second officer, and the prosecutor responded:

I don't, Your Honor. All I have is notes from Detective Flores, although, it does look like—there's one additional page of notes, I assume they were Detective Flores,' they could be the other officers'. I can't tell by the handwriting ... [and] I don't have any other officers listed either besides Detective Flores. I have an arresting officer who would have arrested [appellant] on a warrant, but other than that I don't have any other officers.[16]

Satisfied with this response, the court asked appellant's counsel to move on to his "substantive questions," noting that "hopefully we're not going to delay this any further because there won't be any more continuances. We're going to go through from beginning today until we finish today regardless of commitments."

The question before us is whether the trial court's exchange with the prosecutor sufficed as an adequate inquiry "to determine whether a document contains a 'statement' producible under Jencks." *(Jessie) Hilliard,* 638 A.2d at 703. We have adopted the procedure outlined by the D.C. Circuit in *(Isaac) Williams v. United States,* 328 F.2d 178 (D.C.Cir.1963), to determine whether a particular statement is producible under the Jencks Act. *See (Jessie) Hilliard,* 638 A.2d at 703. In *(Isaac) Williams,* the court stated:

A trial judge is to conduct such inquiry as may be necessary to determine whether or not the conditions of the statute have been satisfied. His inquiry may involve an interrogation of witnesses, or he may make an *in camera* examination of the statement, or the circumstances may call for both such *in camera* examination and interrogation of witnesses.

328 F.2d at 180 (quoting *(Benjamin) Hilliard v. United States,* 317 F.2d 150, 151 (D.C.Cir.1963)).

---

**16.** The record and briefs do not say whether the "additional page of notes" was disclosed to the defense.

In subsequent cases, we have held fast to the duty of the trial court to "conduct such an inquiry as may be necessary" to ascertain whether the government has met its obligation under the Jencks Act. *See, e.g., Hill v. United States,* 858 A.2d 435, 450–51 (D.C.2004); *Johnson,* 800 A.2d at 696; *Flores,* 698 A.2d at 474; *Bayer,* 651 A.2d at 308. In *Bayer,* we determined (and the government conceded) that the trial court erred in failing to conduct an investigation—either an *in camera* inspection or an in-court inquiry—of "whether the police officer's notes qualified as a 'statement'" under the Jencks Act. 651 A.2d at 311. We remanded the case so that the trial court could make an independent determination whether the material qualified under the Act. *Id.* at 312. Similarly, in *Johnson,* we held that once the defense had established a "reason to believe" that a Jencks statement may exist, the trial court abused its discretion in declining to order production of Jencks material, based on acceptance of the government's untested representation that it had no such statement. 800 A.2d at 700. There, we stated that although the prosecutor was unaware of any Jencks material, "[t]he prosecutor's lack of awareness of any notes did not establish that they did not exist or could not be found." *Id.* at 701. We therefore remanded the case to allow the court to conduct "an appropriate evidentiary inquiry." *Id.* In *Hill,* we similarly remanded the case because the trial court had not made an independent inquiry into the existence of Jencks materials, and instead instructed the prosecutor to "let [defense counsel] know if something does exist." 858 A.2d at 451.

Appellant places most weight on *Flores.* In *Flores,* the victim of an assault testified that she had given a statement to Detective Nelson Valdes that was never produced to the defense. 698 A.2d at 476–77. We determined that the trial court abused its discretion by "declin[ing] to make further inquiry" into the existence of Jencks material after the prosecutor represented that there was no such material in the papering notes. *Id.* at 481. Noting that "the trial court should have undertaken an independent Jencks inquiry into the existence and location of notes taken by the police of [the witness's] statement," we said that the "court could have called Detective Valdes as a witness, or asked the prosecutor to inquire directly of Detective Valdes or of the Assistant U.S. Attorney who spoke with the detective in the process of papering the case." *Id.* We concluded that because "[the complainant's] credibility was crucial to the determination of [the defendant's] guilt or innocence," reliance on the papering notes of an absent prosecutor contradicted by the complainant's testimony, did not "discharge the court's responsibility to conduct an independent inquiry." *Id.* at 481–82.

Measured against the standards established in our cases, the trial court abused discretion in summarily accepting, without additional inquiry, the prosecutor's representation that "all I have" were the notes taken by Detective Flores. Certainly, in a situation such as this, where the complaining witness has specifically testified that a second police officer made notes of her statement and where even the prosecutor expressed some doubt about the source of an "additional page" of notes, the trial court was obligated to make an independent inquiry "to determine whether or not the conditions of the statute have been satisfied." *(Isaac) Williams,* 328 F.2d at 180. In this case, the court could have examined the notes *in camera* to attempt to determine who wrote the unattributed "additional page of notes" the prosecutor had identified, the court could have questioned G.F. in more depth to ascertain the identity of the second police officer and the

circumstances of G.F.'s statement to that officer, and the court could have asked Detective Flores (who testified the following day) about her knowledge of any additional notes produced by another officer. But simply to accept the prosecutor's representation without conducting any independent inquiry at all into the existence of potential Jencks material from a second officer is plainly not an appropriate evidentiary inquiry under the circumstances. *See (Nathan) Williams v. United States,* 355 A.2d 784, 788 (D.C.1976) ("We conclude that the trial court erred in failing to determine whether any notes were taken by a second police officer and if so, whether they constituted a statement producible under the Jencks Act."); *Johnson,* 800 A.2d at 701 ("The prosecutor's lack of awareness of any notes did not establish that they did not exist or could not be found."); *Flores,* 698 A.2d at 481 (holding that "the trial court has a duty to conduct an independent inquiry into the existence of Jencks material once a witness testifies that an officer took notes of a statement," even though prosecutor informed court that papering notes in government's file stated that officer had denied having any notes).[17]

▮▮▮▮ Of course, "even if the court erred in its application of the Jencks Act, any such error is subject to a harmless error analysis." *Lyles,* 879 A.2d at 982–83. We will hold an error harmless if, under the familiar *Kotteakos* standard, we are satisfied "with fair assurance, after pon-

dering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In *Bayer,* we determined that the trial court's error was not harmless because the government's case turned on whether the appellants were culpable as aiders and abettors rather than as principals, and "we [could not] conclude that the jury would have reached the same verdict without the testimony of the only witness [as to whom Jencks materials were at issue] . . . who identified appellants as the individuals who actually kicked [the victim]." 651 A.2d at 312. Similarly, we held the trial court committed reversible error in *Cook v. United States,* 828 A.2d 194 (D.C.2003), where the court sidestepped conducting a proper Jencks inquiry by finding that the victim's statement to police was "lost" because the prosecutor did not have a copy and the subpoenaed officers did not appear in court. *Id.* at 198 n. 5. We noted that appellant "did not have other Jencks Act statements with which to impeach a government witness, nor was there testimony from other government witnesses to corroborate that of [the victim], the government's only witness." *Id.* at 201 (citing *Moore v. United States,* 657 A.2d 1148, 1152 (D.C.1995)). Contrarily, in *Moore,* we held the trial court's error was harmless because defense counsel had three other Jencks Act statements in her possession with which to attempt to impeach the

---

17. Part of the court's inquiry should include asking the prosecutor about the steps he or she has taken to obtain and disclose to the defense impeachment information from the investigators, police officers, and other members of the prosecution team, as required by *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). *See also* U.S. Attorney Manual, § 9–5.001(B)(2) (2006) ("It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." (citing *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555)).

complainant, and the complainant's testimony was corroborated by other testimony. 657 A.2d at 1152. There, "[w]e s[aw] no reasonable likelihood that the police notes, whatever they may have contained, could have had a significant effect on the outcome of the trial or produced a different result." *Id.* In *(Nathan) Williams,* we held harmless the trial court's error in failing to determine whether a second police officer took notes producible under the Jencks Act because a review of the trial record demonstrated "that the error was harmless where·[the] importance of notes was considerably diminished by [the] fact that [the] defendant was supplied with other comprehensive notes of very same interview." 355 A.2d at 784, 789. Similarly, we found that the failure to produce a witness's grand jury testimony was harmless error in *Middleton v. United States,* 401 A.2d 109, 123 (D.C.1979), by "[v]iewing the testimony of the witness ... in context of the exceptionally strong case against appellant adduced from the testimony of the other witnesses." *Id.*

 In this case, unlike in *Bayer,* where we concluded the error was not harmless, defense counsel had Jencks material of G.F.'s interview with Detective Flores. Counsel was able to cross-examine G.F. about inconsistencies in her testimony, in particular, that G.F. testified on direct examination that appellant had touched her breasts on top of her clothes, and denied having told Detective Flores when she was interviewed on September 27, 2008, that appellant "put his hand under [her] shirt and touched [her] chest." At trial, Detective Flores confirmed that earlier statement by reference to her report, which had been disclosed to the defense. The impeachment value of Detective Flores's report was negligible, however, because G.F. explained at trial that appellant was "try-

ing" to reach inside her shirt. Counsel also had other non-Jencks material to impeach G.F. Counsel was able to present evidence (through Aunt Telma) suggesting that G.F. fabricated the sexual abuse in an effort to oust appellant from the apartment in order to help her family get its own apartment. Although vague and inconsistent in a number of respects, G.F.'s statements about the assault were substantially corroborated by her sister, M.F., her cousin, M.L. and her mother. These factors weigh in favor of holding the court's error harmless. . *See, e.g., Moore,* 657 A.2d at 1152.

However, this case is also different from those cases where we have found harmless error because of the significance of G.F.'s testimony as the complainant, *see Flores,* 698 A.2d at 481–82, the lack of information regarding the likely content of the missing Jencks material and whether its substance had already been presented at trial through other witnesses or cross-examination, and the possibility (discussed *infra*) that there might be other government agents with Jencks material. *See Moore,* 657 A.2d at 1150 (holding no Jencks Act sanction required "because the information contained in the medical report was also available in three other documents which had already been turned over to defense counsel"); *(Nathan) Williams,* 355 A.2d at 787–88 (holding the error harmless where the trial court did not strike the testimony of complainant, but recognized that "there are other sanctions ... that the Jencks Act provides" and granted defense counsel "wide latitude in cross-examining any witness concerning possible statements made" by the complainant); *Middleton,* 401 A.2d at 123 (holding the error harmless because the witness's testimony was "relatively inconsequential.... [as][s]he was unable at any time to identify either of the robbers.... [and][s]he did not corroborate testimony of other witnesses").

In light of G.F.'s importance as the complaining witness, her inconsistent testimony, the conflict between G.F.'s testimony and that of other witnesses, and the suggestion that G.F. had a motive to fabricate, however, we cannot agree with the government's argument that "[t]here is no reason to believe that any additional notes taken by another police officer ... would have contained impeachment material that would have appreciably damaged G.F.'s credibility." Without knowing whether there are any notes, and if so, what they contain, we cannot accept such a speculative argument. *See (Nathan) Williams,* 355 A.2d at 788 (noting that "government should have been required to produce the second officer or explain why it could not"). To the contrary, we have held that "[i]n evaluating the possibility of harmlessness without the notes, 'we must assume the worst: that these notes constituted or included a witness's 'statement' under 18 U.S.C. § 3500(e), that the statement would have provided serious impeachment material, and that the failure to produce the statement, therefore, would have resulted in striking [the witness's] direct testimony under 18 U.S.C. § 3500(d).' "[18] *Johnson,* 800 A.2d at 701 (quoting *Bayer,* 651 A.2d at 311) (remanding for trial court to determine whether the police officer's notes should have been turned over to defendant for use in cross-examining complaining witness). In light of G.F.'s critical importance as the complaining witness, if we "assume the worst" in the absence of an independent inquiry by the trial court, we could not say that the judgment was not substantially swayed by the trial court's

error. Indeed, without G.F.'s testimony, the evidence would most likely be insufficient.

As we concluded in *Johnson,*

[w]e therefore must remand the case for the trial court to conduct an appropriate evidentiary inquiry. *Bayer v. United States,* 651 A.2d 308, 311 (D.C.1994). If the government is able to produce the notes, the court must inspect them *in camera* to determine whether they qualify as a Jencks "statement" (assuming, of course, that the government does not concede the point). If so, [appellant] is entitled to a new trial unless the court finds that the notes "could not have been used to discredit" the complaining witness. *Id.* at 312 n. 4. If the government is not able to produce the notes for inspection, the court must hold an evidentiary hearing to determine whether the notes ever existed in the first place and, if they did, the nature and potential importance of the notes and the circumstances surrounding their loss or destruction. The court then will be in a position to decide, in the exercise of its informed discretion, whether to grant [appellant] a new trial because the government violated its "duty of preservation." *Montgomery v. United States,* 384 A.2d 655, 662 (D.C.1978). In making that decision, the court should consider, in particular, the degree of negligence or bad faith involved in the loss of the notes, whether the notes still could have been produced at the time of trial, and the extent to which [appellant] was prejudiced by his inability to use the notes to cross-examine the complaining

---

**18.** After a finding that Jencks material exists, "the Act provides two sanctions for nonproduction of a statement in the government's possession: the court may either strike the testimony of the witness involved or declare a mistrial," *(Nathan) Williams,* 355 A.2d at 788 n. 9 (citing 18 U.S.C. § 3500(d) (1970)); however, "under the limited circumstances in which a statement, once in the government's possession, has been lost or is no longer producible," other sanctions may be appropriate, including a "variant of the missing witness instruction." *Id.*

witness. *See, e.g., Lee v. United States,* 699 A.2d 373, 390 (D.C.1997). 800 A.2d at 701. *See Campbell v. United States,* 365 U.S. 85, 98, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961) (remanding case to trial court for further independent inquiry into existence of Jencks material).

### 2. Notes from G.F.'s Interview with the Prosecutor.

██ During cross-examination, G.F. testified that she had spoken with the prosecutor, who had taken notes during their conversation. Appellant's counsel then raised with the court the possibility that there was outstanding Jencks material relating to the prosecutor's talk with G.F. The court responded, "[The prosecutor] indicated there's no Jencks material," and the prosecutor added that "[g]overnment counsel did not seek [19] any notes during—meeting with the complaining witness."

We conclude that the trial court did not abuse discretion in this instance. The government argues that *Flores* is distinguishable from this case because here the prosecutor who tried the case was the same prosecutor who interviewed G.F. before trial, and, based on her first-hand knowledge, she represented that she did not take any notes during her meeting with G.F. We agree that, absent compelling evidence to the contrary, when a court receives an assurance directly from the prosecutor—an officer of the court—that she did not take any notes during her interview with a witness, the court satisfies its duty of independent inquiry "to determine whether or not the conditions of the [Jencks Act] have been satisfied." *(Isaac) Williams,* 328 F.2d at 180. Under these circumstances, nothing further was required of the trial court.

### 3. Notes from Police Interview with Josephine Roa.

██ After the government finished its direct examination of Josephine Roa (G.F.'s mother), defense counsel requested that all Jencks material relating to her be turned over. The government represented to the court that there was no Jencks material for Roa. Defense counsel then elicited testimony from Roa that she spoke to Detective Flores "between three and five" times, during which Detective Flores had a pen or pencil in her hand and "could have been" writing notes down. However, Roa testified, she "wasn't actually looking" because she was "focusing on ... what [Detective Flores] was asking me [rather] than what she was doing."

There is no dispute that Roa was interviewed by Detective Flores, an agent of the government, about G.F.'s account of sexual abuse by appellant. Thus, if there were notes or any other record of these interviews, the court would be required to conduct an independent inquiry to determine whether they constituted a "substantially verbatim recital" of Roa's statements, 18 U.S.C. § 3500(e)(2). The issue here is whether Roa's testimony that Detective Flores held a writing instrument in hand during the interviews and "could have been" taking notes sufficed to trigger the court's obligation to inquire. In similar cases, we have held that counsel must elicit some showing by a witness that notes *do* exist, or that there is some *reason to believe* that notes exist. *See, e.g., Moore,* 657 A.2d at 1151 ("All that the defense has to establish is reason to believe that a

---

**19.** In its brief, the government contends that the word "seek" in the transcript was the result of either a misstatement by the prosecutor or an error in transcription. The government argues that the statement should be understood as: "Government counsel did not [take] any notes during—meeting with the complaining witness."

statutory statement may exist."); *see also Johnson*, 800 A.2d at 700 ("[C]ounsel need elicit only that the witness was interviewed by an agent of the government, who made notes of the conversation."); *Flores*, 698 A.2d at 481 ("[T]he trial court has a duty to conduct an independent inquiry into the existence of Jencks material once a witness testifies that an officer took notes of a statement."). Roa's testimony that Detective Flores "could have been" taking notes suggests the *possible* existence of Jencks material, but it falls just short of supporting the *apparent* existence of Jencks material. *See Hill*, 858 A.2d at 450–51 ("Once the apparent existence of the notes is established by the witness's testimony and defense counsel has moved for production, the trial court is under an affirmative duty" to conduct further inquiry). Here the issue is a close one because the record is ambiguous. Roa's testimony did not give the trial court "reason to believe," *Moore*, 657 A.2d at 1151, that there was Jencks material related to the interview with Detective Flores, but on the other hand, her testimony suggested more than a "speculative possibility" *Goldberg*, 425 U.S. at 124, 96 S.Ct. 1338. Roa repeatedly answered that she did "not know" whether notes were taken or her statement recorded, and it would be reasonable to think that a detective investigating a case who has several interviews with the mother of a child who has been sexually abused would take some notes to aid her memory. We think that where defense counsel has requested Jencks material, and there is some question, rooted in testimony, about the possible existence of such material, the trial court's "affirmative duty," *Bayer*, 651 A.2d at 311, requires that the judge conduct an inquiry tailored to the situation, enough to at least dispel the possibility raised by the witness's testimony. In this case, for example the trial court could have asked Detective Flores, who testified at trial the day after Roa took the stand, whether she had taken notes during her interviews with Roa before ruling on appellant's motion.[20] As we are remanding the case for further inquiry with respect to G.F.'s interview with the second police officer, we are confident that the trial court will make similar inquiry with respect to Detective Flores's several interviews with G.F.'s mother.

### 4. Statement Written by Roa and Given to Social Worker.

 During the defense cross-examination of Roa, she testified that she had given a hand-written statement about the assault to a social worker who was called by the "school." Appellant's counsel asked the court to order that the statement be produced as Jencks material. The court inquired how a social worker would qualify as a government agent because "the social worker doesn't work for [AUSA Suttenberg] or the U.S. [A]ttorney's [O]ffice," and asked counsel to file a memorandum in support of his request. Defense counsel filed a memorandum the next morning, arguing that the Child and Family Services Agency (CFSA) is an investigative arm of the D.C. government and that it was involved in investigating "the exact crime" the government was prosecuting. In his memorandum, counsel relied on *Robinson v. United States*, 825 A.2d 318 (D.C.2003), for the proposition that "the duty of disclosure affects not only the prosecutor, but 'the government as a whole, including its investigative agencies,' because the Jencks Act refers to evidence gathered by 'the government,' and not simply that held by the prosecution." *Id.* at

---

20. We note, however, that defense counsel also did not ask Detective Flores whether she had taken any notes of her meetings with G.F.'s mother.

327 (quoting *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990)). The motion argued that if the government did not turn over the statement, Roa's testimony should be stricken and the court should declare a mistrial. Before closing arguments the same day, appellant's counsel raised the matter once more with the court, arguing that the government's "duty of disclosure affect[s] not only the prosecutor but the government as a whole, especially investigative agencies." The court responded that all counsel had elicited from Roa was that she gave a statement to an "unidentified social worker," but had not shown that the social worker was affiliated with the government. Nonetheless, the court asked the prosecutor whether she had any Jencks material relating to the social worker, and the prosecutor again represented that the government had turned over "everything in its custody and control."

Appellant argues that the trial judge erred by not inquiring further into the identity of the social worker, and that the trial court "erroneously placed the burden of proving the circumstances surrounding Ms. Roa's statement on the defense." Appellant contends that Roa's statement that the "school" called "child and family services," in combination with Detective Flores's affidavit "describ[ing] the case as originating in a referral from a social worker" was sufficient to trigger the court's obligation to conduct an independent inquiry into the existence of a Jencks statement. After reviewing the record before us, we disagree.

There is no question that Roa's handwritten account of what her daughter told her would be Jencks material if it was given to "an agent of the government." *See Johnson*, 800 A.2d at 700. However, there was no evidence that Roa gave her statement to a police officer or detective, who would be considered an agent of the government's investigatory branch, *see Lyles*, 879 A.2d at 983 (holding the duty of disclosure extends beyond the prosecution to "the government as a whole, including its investigative agencies"); instead the statement was given to an unidentified social worker who might have been employed by CFSA, an agency of the District of Columbia. In his brief, appellant cites to *United States v. White Horse*, 316 F.3d 769, 773 (8th Cir.2003), for the proposition that a social worker's report and videotaped interview would be producible under the Jencks Act. That case, however, is distinguishable because it was established and recognized by the court in *White Horse* that the social worker was employed by the government and that the defendant was able to view the videotaped interview while he was detained at the jail, which showed that it was in the possession of the government. *See id.* at 773.

Here, appellant did not present a "reason to believe" that the "material ... [was] in the possession of the government," the first of four prerequisites that must be met in lodging a proper Jencks Act claim. *Lyles*, 879 A.2d at 983 n. 12. Roa did not say that the social worker was employed by the CFSA, and Detective Flores's affidavit did not allege this fact, as appellant argues in his brief. Detective Flores's affidavit in support of an arrest warrant stated only that "the Metropolitan Police Department received information" of the assault, but did not detail the source or the form of the information. Although the affidavit does say that G.F.'s mother "reported" details of the incident to Detective Flores, it does not mention a written report. Moreover, the only mention of a social worker in Detective Flores's affidavit is that G.F. "was also forensically interviewed at the Children's Advocacy Center," which is not the CFSA, the government organization to whom ap-

pellant alleges Roa submitted her handwritten statement. On this record, we cannot say that the court was given "reason to believe" that Roa's statement to an unidentified social worker was within the possession of the government, and, therefore, the court was not obligated to make further Jencks inquiry. If, however, on remand, appellant is able to make any showing that the social worker to whom G.F.'s mother gave her written statement worked for CFSA or some other part of the "prosecution team," broadly understood, *see supra* note 17, the trial court should conduct an independent inquiry into whether the statement is Jencks material that must be produced under Rule 26.2.

Accordingly, for the foregoing reasons, appellant's case is

*Remanded.*