# District of Columbia
# Court of Appeals

**No. 14-CM-125**

JESUS A. HERNANDEZ,

Appellant,

v.



FILED

JAN **14** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

UNITED STATES,

**DVM-2124-13**

Appellee.

On Appeal from the Superior Court of the District of Columbia<br/>Criminal Division

BEFORE:  Fisher and McLeese, Associate Judges; and Ruiz, Senior Judge.

**J U D G M E N T**

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the matter on appeal is remanded for further inquiry into whether the prosecutor's notes are producible as a Jencks statement. If the trial court finds that the notes contain Jencks material, the trial court should disclose the pertinent portion of the notes to the defense and permit the parties to brief the question whether nondisclosure was harmless because the notes could not have been used to seriously impeach witness, Ms. Argueta-Avila.  If the trial court finds that the nondisclosure was not harmless, the trial court should vacate the judgment and order a new trial.  If the trial court concludes that the notes do not contain Jencks material, or that any nondisclosure was harmless, the trial court should make the notes part of the record under seal, supplement its findings, and enter a new final judgment of conviction to preserve Mr. Hernandez's right to seek further appellate review.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  January 14, 2016.

Opinion by Associate Judge Roy W. McLeese.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CM-125

JESUS A. HERNANDEZ, APPELLANT,

FILED 1/14/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DVM-2124-13)

(Hon. Fern Flanagan Saddler, Trial Judge)

(Argued September 25, 2015                          Decided January 14, 2016)

*Geneva G. Vanderhorst* for appellant.

*Vanessa Goodwin*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Suzanne Grealy Curt*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

MCLEESE, *Associate Judge*: Appellant Jesus A. Hernandez challenges his assault conviction, arguing that the evidence was insufficient and that the trial court failed to conduct an adequate inquiry into whether the United States was required to disclose notes taken by a prosecutor during an interview of a

government witness.  We hold that the evidence was sufficient, and we remand for further inquiry into the disclosure issue.

## I.

The evidence at trial was as follows.  At the time of the offense, Mr. Hernandez was living with his girlfriend, Jemima Argueta-Avila.  They went to a party together, and Ms. Argueta-Avila saw Mr. Hernandez drink a beer during that time.  Ms. Argueta-Avila left without Mr. Hernandez, to visit a neighbor.  After she left, Mr. Hernandez called her on the phone more than five times over a period of about twenty minutes, but she did not answer the calls.  When Ms. Argueta-Avila left her neighbor and went outside into an alley, she saw Mr. Hernandez, who followed her.  She ran ahead, because she was afraid that Mr. Hernandez would be angry at her for not returning his calls.  Ms. Argueta-Avila also felt angry and wanted to get home so that the couple could talk there.

Ms. Argueta-Avila testified that Mr. Hernandez grabbed her shirt, causing it to tear, and pushed her, causing her to fall.  Ms. Argueta-Avila suffered scrapes and other minor injuries from the fall.  She told the police that Mr. Hernandez did not assault her, that he had grabbed her by the shirt, and that she had fallen.  When

she told the police that Mr. Hernandez did not assault her, she meant that he did not hit her. Ms. Argueta-Avila did not see anyone else in the alley that evening.

Mr. Andre Hawthorne testified that he saw the incident as he was walking through the alley on the way home from work. At first, it appeared to Mr. Hawthorne that Ms. Argueta-Avila was trying to get around Mr. Hernandez, who was blocking her path. When Mr. Hawthorne asked if they were all right, Mr. Hernandez said yes but Ms. Argueta-Avila did not answer. Ms. Argueta-Avila appeared scared to Mr. Hawthorne. Mr. Hawthorne walked past but continued to keep an eye on the couple. He saw Mr. Hernandez's hand on Ms. Argueta-Avila's arm, and Mr. Hernandez appeared to be trying to persuade Ms. Argueta-Avila to do something. Mr. Hawthorne was concerned about what he had seen, so he called 911. While he was on the phone, watching from a distance of about sixty to seventy feet, Mr. Hawthorne saw Mr. Hernandez choke Ms. Argueta-Avila and then saw Ms. Argueta-Avila fall to the ground. The United States introduced a recording of Mr. Hawthorne's 911 call into evidence, but that recording was not transcribed during trial and has not been made part of the record on appeal.

Mr. Hawthorne had previously been convicted of armed robbery, robbery, assault with a dangerous weapon, and obstruction of justice. Mr. Hawthorne never

saw Mr. Hernandez hit, shove, or push Ms. Argueta-Avila. Mr. Hawthorne did not speak to the police who arrived on the scene about what he had seen.

Officer Benjamin Rubin responded to the incident within about a minute of receiving a call about an assault in progress. When he arrived, he saw Ms. Argueta-Avila sitting on the ground, with Mr. Hernandez standing over her. Ms. Argueta-Avila was pretty frantic and was shaking and crying. Her shirt was ripped, and she had scratches on her chin and arm. Mr. Hernandez appeared calm.

After realizing that neither Mr. Hernandez nor Ms. Argueta-Avila spoke English, Officer Rubin called for a Spanish-speaking officer. Officer Jose Hernandez arrived within three minutes. Officer Hernandez testified that Ms. Argueta-Avila was crying hysterically and had a torn shirt and scratches on her chin and arm. Ms. Argueta-Avila was generally unwilling to say what had happened. Ms. Argueta-Avila did say, however, that she was very afraid of Mr. Hernandez. She also indicated that "every time he drinks he does this." Officer Hernandez understood the latter statement to mean that Mr. Hernandez became aggressive when he drank alcohol and that he had "put his hands on" Ms. Argueta-Avila in the past. Although his testimony on the point was equivocal, Officer

Hernandez ultimately testified that Ms. Argueta-Avila said that Mr. Hernandez did not assault her. Officer Hernandez smelled alcohol on Mr. Hernandez's breath.

Based on this evidence, the trial court found Mr. Hernandez guilty. The trial court credited Ms. Argueta-Avila's testimony. Specifically, the trial court found that Mr. Hernandez grabbed Ms. Argueta-Avila's shirt and pushed her. The trial court accepted Ms. Argueta-Avila's explanation that, when she told the police that Mr. Hernandez did not assault her, she meant that he had not hit her. The trial court also explained that the testimony that Ms. Argueta-Avila felt angry did not undermine the conclusion that she was assaulted.

Turning to Mr. Hawthorne, the trial court found that he was an unbiased witness. The trial court credited Mr. Hawthorne's testimony that Ms. Argueta-Avila had appeared frightened and that Mr. Hawthorne saw Mr. Hernandez choking Ms. Argueta-Avila. The trial court also relied on Mr. Hawthorne's statements in the 911 call that Mr. Hernandez was choking Ms. Argueta-Avila. Finally, the trial court credited the testimony of both police officers as to Ms. Argueta-Avila's demeanor and injuries. After making these findings, the trial court concluded that "the Government met its elements in showing that the

defendant with force or violence injured the complaining witness, and did so voluntarily, on purpose, and not by mistake."

## II.

When assessing whether the evidence at trial sufficiently supports a conviction, we view the evidence in the light most favorable to the verdict and defer to the fact-finder's credibility determinations. *Contreras v. United States*, 121 A.3d 1271, 1276-77 (D.C. 2015). The evidence is sufficient if any rational fact-finder could have found the elements of the crime beyond a reasonable doubt. *Id.* at 1277.

The evidence credited by the trial court sufficed to support Mr. Hernandez's assault conviction. Specifically, the trial court found that Mr. Hernandez purposely pushed and choked Ms. Argueta-Avila. Such conduct constitutes assault. *See, e.g.*, *Dunn v. United States*, 976 A.2d 217, 220-21 (D.C. 2009) (evidence that defendant intentionally pushed victim sufficed to support assault conviction); *McCoy v. United States*, 781 A.2d 765, 768-69 (D.C. 2001) (evidence that defendant choked victim, threatened victim with knife, and pushed victim

down stairs supported conviction for assault with dangerous weapon). We are not persuaded by Mr. Hernandez's contrary arguments.

First, Ms. Argueta-Avila's reluctance to tell the police what happened does not undermine the sufficiency of the evidence. *Cf., e.g.*, *Jones v. United States*, No. 13-CF-182, 2015 WL 4113369, at *16 (D.C. July 9, 2015) ("[A] witness may be inaccurate, contradictory and even untruthful in some respects and yet be entirely credible in the essentials of his testimony.") (internal quotation marks omitted); *Payne v. United States*, 516 A.2d 484, 493 (D.C. 1986) (per curiam) ("[C]onflicts created by a witness'[s] recantation, like other internal inconsistencies within a witness'[s] testimony, are factual questions for the jury to resolve."; jury could have found that witness recanted at trial out of fear).

Second, the trial court reasonably accepted Ms. Argueta-Avila's explanation that, when she told the police that Mr. Hernandez did not assault her, she meant that he had not hit her. Ms. Argueta-Avila's testimony thus did not contradict the conclusion that Mr. Hernandez assaulted Ms. Argueta-Avila.

Third, contrary to Mr. Hernandez's assertions that the trial court did not make an adequate finding as to intent, the trial court explicitly found that Mr.

Hernandez pushed and choked Ms. Argueta-Avila and injured her voluntarily, on purpose, and not by mistake.

Fourth, evidence that Ms. Argueta-Avila was angry during and after the incident does not negate the evidence that Mr. Hernandez assaulted her. *Cf., e.g.*, *In re D.R.*, 96 A.3d 45, 47 n.2 (D.C. 2014) (establishing offense of assault does not require proof that victim felt fear). In any event, there was evidence that Ms. Argueta-Avila appeared frightened and said she was afraid of Mr. Hernandez.

Finally, Mr. Hernandez challenges the trial court's decision to credit Mr. Hawthorne's testimony, arguing that Mr. Hawthorne was impeached with prior convictions and that his testimony with respect to the choking was not corroborated by the testimony of other witnesses. "This court will not reverse a trial court's factual findings after a bench trial unless those findings are 'plainly wrong or without evidence to support them.'" *Contreras*, 121 A.3d at 1277 (quoting D.C. Code § 17–305 (a) (2012 Repl.)) (brackets omitted); *see also, e.g.*, *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007) ("[T]his court is not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness. That determination is for the fact-finder to make and is made in large part[ ] based on factors that can only be ascertained after

observing the witness testify."). We see no basis to look behind the trial court's credibility determinations in this case.

## III.

Mr. Hernandez also argues that the trial court failed to conduct an adequate inquiry into whether the United States was required to disclose to Mr. Hernandez notes of a prosecutor's interview with Ms. Argueta-Avila. We agree.

## A.

The Jencks Act, 18 U.S.C. § 3500 (2012), is implemented in the District of Columbia by Superior Court Rule of Criminal Procedure 26.2. *Fadul v. District of Columbia*, 106 A.3d 1093, 1096 (D.C. 2015). Rule 26.2 (a) provides that, once a witness other than the defendant has testified on direct examination, the court upon request must order the attorney for the party calling the witness to produce "any statement" in the attorney's possession relating to the subject matter of the witness's testimony. *See also, e.g.*, *Frye v. United States*, 600 A.2d 808, 810 (D.C. 1991) ("[T]he duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies.") (internal quotation

marks omitted). The definitions of "statement" include "a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof." Super. Ct. Crim. R. 26.2 (f)(2). The notes of a prosecutor's interview with a government witness can be subject to disclosure under the Jencks Act if the notes are substantially verbatim and were contemporaneously taken. *Rease v. United States*, 403 A.2d 322, 326-27 (D.C. 1979) (per curiam). "[T]he 'work product' doctrine does not shield from discovery writings, such as government attorneys' interview notes, that are otherwise producible under the Act." *United States v. (Jacqueline) Jackson*, 430 A.2d 1380, 1385 (D.C. 1981).

Trial courts have "considerable discretion" in administering the Jencks Act, and we review decisions regarding the production of Jencks material for abuse of discretion. *Johnson v. United States*, 800 A.2d 696, 699 (D.C. 2002). "Before we will defer to the trial court's ultimate ruling on production, however, the court must conduct a proper inquiry and make relevant findings." *Lazo v. United States*, 54 A.3d 1221, 1231 (D.C. 2012). A proper request for production of a statement under the Jencks Act triggers the trial court's "affirmative duty, either by interrogation or by *in camera* inspection, to ascertain whether the statement is one

defined by the Act itself as producible material and whether it is in the possession of the government." *Lazo*, 54 A.3d at 1232 (internal quotation marks omitted). A party need not establish that a Jencks statement unquestionably exists to trigger a duty of further inquiry by the court. *Id.* Rather, the requesting party need only elicit testimony that an agent of the government interviewed the witness and took notes of the conversation. *Id.*

**B.**

During the trial, defense counsel established that Ms. Argueta-Avila had met with the trial prosecutor in preparation for her testimony and that the prosecutor had taken notes during at least one of those meetings. When defense counsel requested that the trial court order production of the notes as Jencks material, the trial court declined, explaining that defense counsel had not established that the notes were "verbatim" and thus discoverable under the Jencks Act. The trial court also denied defense counsel's request that the court review the notes in camera.

The trial court asked the prosecutor several times whether the United States was in possession of any Jencks statements, and the trial court also directed the prosecutor to turn over any such statements. The prosecutor acknowledged that

she had taken notes during an interview of Ms. Argueta-Avila, but denied possessing any Jencks statements. Specifically, the prosecutor stated that her notes were not transcripts or "continuous narrative reportings," but rather were "selective notations, or excerpts from oral statements" that did not constitute Jencks statements. The trial court ultimately concluded that "it had received an assurance from the prosecutor, who is an officer of the [c]ourt, that she did not take any notes during her interview with [Ms. Argueta-Avila] that will satisfy the Jencks requirement."

The United States acknowledges that the trial court in this case was required to conduct an adequate inquiry into whether the prosecutor's notes of the interview with Ms. Argueta-Avila were subject to production under the Jencks Act. We agree. *See, e.g.*, *Lazo*, 54 A.3d at 1232. Witnesses who are being interviewed often will not see what the interviewer writes down or, as in this case, may not understand what is written down because of a language barrier. For that reason, the party seeking disclosure of interview notes is not required to prove what was written down, and rather need only show that notes were taken during the course of an interview concerning the events of the case. *Id.* Once that initial showing is made, the trial judge must make an adequate inquiry or review the notes to determine whether they are Jencks material. *Id.*

The United States argues, however, that the trial court permissibly concluded, after adequate inquiry, that in camera review of the notes in this case was not necessary. We conclude otherwise.

We view this case as largely controlled by our decision in *Matthews v. United States*, 322 A.2d 908 (D.C. 1974). In that case, defense counsel established that the prosecutor had taken notes during interviews of two government witnesses. *Id.* at 909. When defense counsel moved for production of the notes, the prosecutor said, "all of the notes I took, none of them were verbatim. I never take verbatim notes." *Id.* The trial court denied the request for production of the notes without reviewing the notes in camera. *Id.* We held that the trial court erred by denying the request for production based on the "factually unsupported" "bare conclusion from the prosecutor that his notes were not substantially verbatim." *Id.* at 910. As we explained,

> The trial court . . . in effect allowed the government to determine whether the notes were producible under the Act. . . . The [Act] does not vest in the government the unilateral power to determine without judicial supervision the question of whether or not the statement falls within the purview of the statute. When a controverted question . . . arises, it is for judicial determination with the judge acting as arbiter.

*Id.* (internal quotation marks omitted). We therefore remanded the case for the trial court to conduct a further inquiry to determine whether the prosecutor's notes were substantially verbatim. *Id.* at 910-11. We have taken a similar approach in a number of comparable cases. *See, e.g.*, *Johnson*, 800 A.2d at 698-701 (remanding for trial court to conduct in camera review of notes taken by police officer during interview of government witness); *cf. In re S.W.B.*, 321 A.2d 564, 566 (D.C. 1974) (trial court should have conducted further examination or investigation rather than accepting prosecutor's representation that notes were not substantially verbatim).

In *Matthews*, this court distinguished the Supreme Court's opinion in *United States v. Augenblick*, 393 U.S. 348 (1969). *Matthews*, 322 A.2d at 910. In *Augenblick*, the Supreme Court upheld a determination that the notes of an agent's interview of a government witness were not producible under the Jencks Act, even though the notes had not been reviewed in camera. *Augenblick*, 393 U.S. at 353-55. In *Augenblick*, however, there was concrete factual information about the notes at issue: the agent said that he "jot[ted] down a couple of rough notes." *Id.* at 354. This court has ruled similarly in several cases involving "sketchy," "hasty," or "rough" notes. *See, e.g.*, *Strickland v. United States*, 389 A.2d 1325, 1328-29 (D.C. 1978) (no abuse of discretion in declining to grant a new trial based

on nondisclosure of "portion of rough notes" that detective described as "miscellaneous" and not verbatim). In other cases involving police notes, however, we have remanded for further inquiry into whether the notes contained a Jencks statement. *See, e.g.*, *(Calvin) Moore v. United States*, 353 A.2d 16, 18-20 (D.C. 1976) (remanding for determination of whether lost notes containing description of robbers constituted Jencks statement); *cf. also Johnson*, 800 A.2d at 699 ("It is well established that police notes are potentially Jencks Act statements. The mere fact that the notes may be rough does not defeat a Jencks claim, for the form of the statement is irrelevant; the inquiry must focus on the content of the writing and on the circumstances surrounding its making.") (brackets, citation, and internal quotation marks omitted); *(Michael Eric) Jackson*, 450 A.2d 419, 425-26 (D.C. 1982) (per curiam) (upholding trial court's inference that lost notes of witnesses' statements during identification procedure were substantially verbatim; "The requirement that the statement be 'substantially verbatim' is a flexible one, and each statement must be examined in light of circumstances such as (1) the extent to which the writing conforms to the witness'[s] language, (2) the length of the statement as compared to the length of the interview, (3) the lapse of time between the interview and its transcription, (4) the appearance of the substance of the witness'[s] remarks and (5) the purpose for which the statement was taken."). Our cases in this area demonstrate that there is not a clear line between statements

that are substantially verbatim and those that are not. For that reason, we conclude, as we did in *Matthews*, that a trial court cannot properly deny a request for production of a prosecutor's notes based solely on the prosecutor's indication that the notes reflect an unspecified degree of selectivity. Rather, the trial court has "an affirmative duty to determine whether [a Jencks] statement exists . . . [by conducting] such inquiry as may be necessary[,] . . . [which] may involve an interrogation of witnesses, . . . an in camera examination of the statement, or . . . both." *Matthews*, 332 A.2d at 910 (internal quotation marks omitted); *see also id.* (noting that, "in light of the circumstances of each case," trial judge may need to decide "what, if any, evidence extrinsic to the statement itself may or must be offered to prove the nature of the statement") (internal quotation marks omitted). Merely accepting a prosecutor's bare conclusion is not a sufficient "interrogation" that will satisfy the court's affirmative duty to make its own determination whether requested notes come within the purview of Jencks.

Although the United States relies heavily on our decision in *Lazo*, we view that case as readily distinguishable. In *Lazo*, we remanded for further inquiry with respect to several potential Jencks statements. 54 A.3d at 1231-41. We upheld the adequacy of the trial court's inquiry in one respect, however. *Id.* at 1238. After a government witness testified that a prosecutor had taken notes during an interview,

the prosecutor who had conducted the interview represented that she had not taken any notes during the interview. *Id.* We held that, "absent compelling evidence to the contrary, when a court receives an assurance directly from the prosecutor—an officer of the court—that she did not take any notes during her interview with a witness, the court satisfies its duty of independent inquiry . . . ." *Id.*

The critical difference between *Lazo* and the present case is that *Lazo* involved a prosecutor's representation as to a pure question of fact as to which the prosecutor had personal knowledge -- whether any notes were taken. *Lazo*, 54 A.3d at 1238. The trial court's reliance on that representation was in essence a credibility determination that was bolstered by the prosecutor's ethical obligation of candor as an officer of the court. *Id.*; *cf., e.g.*, *Hilliard v. United States*, 638 A.2d 698, 704 (D.C. 1994) (noting that court, "after weighing the credibility of witnesses, may properly credit a police officer's testimony that no statements were recorded"); *(Michael Eric) Jackson*, 450 A.2d at 424 (noting that judge chose to credit testimony of witnesses that they were shown photo arrays and to infer from usual police practice that notes were taken).

In the present case, as in *Matthews* and similar cases, the question was whether notes were substantially verbatim. Although the Supreme Court has

treated that question as predominantly factual in nature, *see Campbell v. United States*, 373 U.S. 487, 492-93 (1963), the line between notes that are substantially verbatim and notes that are not is to a degree a legal question, *see Williams v. United States*, 119 U.S. App. D.C. 177, 180, 338 F.2d 286, 289 (1964) ("[A] finding that written statements are or are not producible under the Jencks Act as substantially verbatim recitals of witnesses' oral statements is not an ordinary finding of fact; it is a factual conclusion arrived at by applying a legal standard to the other facts found."). As we have noted, our cases do not define that line with clarity, and a trial court therefore cannot simply accept, without further inquiry, a prosecutor's conclusory assertion that notes are "selective" or "not substantially verbatim."

## C.

Finally, the United States argues that any error was harmless, because the record contains other substantial evidence of Mr. Hernandez's guilt. We conclude that the United States has not carried its burden of establishing harmless error on the current record.

In assessing whether a non-constitutional error was harmless, we apply the standard set forth in *Kotteakos v. United States*, 328 U.S. 750 (1946), which held that there must be "fair assurance" that the error did not "substantially sway[ ]" the judgment. *Id.* at 765. This standard "precludes us from affirming on a mere hunch that the case would have ended with the same verdict if the erroneous ruling had not been made." *Clark v. United States*, 593 A.2d 186, 192 (D.C. 1991). "To conclude that an error is harmless, we must find it highly probable that [the] error did not contribute to the verdict." *Id.* (internal quotation marks omitted). The government bears the burden of establishing the harmlessness of an error. *Lucas v. United States*, 102 A.3d 270, 279 (D.C. 2014). Where this court does not have access to the potential Jencks statements at issue, we assess harmlessness by assuming that the undisclosed material contained a Jencks statement, that the statement "would have provided serious impeachment material," and that the trial court therefore would have struck the witness's direct testimony. *Johnson*, 800 A.2d at 701 n.4.

Under this approach, the question is whether we can say with fair assurance that the trial court would have found Mr. Hernandez guilty even if Ms. Argueta-Avila had not testified. We lack such assurance. First, Ms. Argueta-Avila was the critical witness at trial, and the trial court treated her as such. In returning a guilty

verdict, the trial court addressed Ms. Argueta-Avila's testimony first, describing in detail how credible it found Ms. Argueta-Avila. It is difficult to predict with confidence how the trial court would have responded to the evidence without Ms. Argueta-Avila's testimony. That difficulty counsels against finding harmlessness on the current record. *See, e.g.*, *Lazo*, 54 A.3d at 1237 (any Jencks error as to complaining witness was not harmless, despite corroborative testimony from other witnesses, given among other things "critical importance" of complaining witness's testimony).

Second, the United States has not presented a clear picture of what the trial would have looked like in the absence of Ms. Argueta-Avila's testimony. Most importantly, the United States has not attempted to explain which of Ms. Argueta-Avila's hearsay statements to police officers would properly have been admitted at a trial in which Ms. Argueta-Avila did not testify. For example, evidence that Ms. Argueta-Avila had been uncooperative and had denied that Mr. Hernandez had assaulted her might have given rise to reasonable doubt, particularly in the absence of any further explanatory testimony from Ms. Argueta-Avila. Ms. Argueta-Avila made other hearsay statements that would if admitted have provided support for a finding of guilt, such as that she was afraid of Mr. Hernandez and that Mr. Hernandez "does this" when he drinks. Nevertheless, absent a more detailed

argument by the United States as to which of Ms. Argueta-Avila's statements would properly have been admitted at a trial in which she did not testify, we lack confidence that the trial court would have necessarily found guilt.

Third, it is not clear that the trial court would have viewed Mr. Hawthorne's testimony as establishing guilt beyond a reasonable doubt in the absence of Ms. Argueta-Avila's testimony, particularly if the trial court also heard evidence that Ms. Argueta-Avila had denied that Mr. Hernandez had assaulted her. Although the trial court stated that it "credited all [of Mr. Hawthorne's] testimony," the trial court did so in a context in which it viewed Mr. Hawthorne's testimony as corroborative of (and thus corroborated by) Ms. Argueta-Avila's testimony. Moreover, Mr. Hawthorne was impeached with prior convictions, he viewed the key part of the incident from a distance, and neither Ms. Argueta-Avila's testimony nor her injuries corroborated Mr. Hawthorne's testimony that Mr. Hernandez choked Ms. Argueta-Avila. Although the corroborative testimony of the police officers about Ms. Argueta-Avila's demeanor and injuries would have provided additional support for a finding of guilt, we nevertheless find ourselves unable to say with adequate confidence that the error did not influence the trial court's finding that Mr. Hernandez pushed and choked Ms. Argueta-Avila.

In contending that any error was harmless, the United States relies primarily on *(Carlton) Moore v. United States*, 657 A.2d 1148, 1151-52 (D.C. 1995), and *Butler v. United States*, 481 A.2d 431, 446-47 (D.C. 1984). Neither decision persuades us that the error in this case was harmless. *Butler* was an appeal from a denial of a motion for new trial based on newly discovered evidence. 481 A.2d at 446. The trial court in *Butler* knew the contents of the previously undisclosed Jencks statements and was thus able to assess whether nondisclosure had actually prejudiced the defense. *Id.* at 446-47. The trial court in *Butler* determined that the credibility of the witness at issue -- an accomplice -- would not have been so undermined by the Jencks statements as to affect the verdict, given the "substantial corroborative evidence" presented. *Id.* In the present case, neither the trial court nor we know what the prosecutor's notes contain. That is why, as we have previously noted, we must assume for current purposes that Ms. Argueta-Avila's testimony would be stricken.

In *(Carlton) Moore*, we found the nondisclosure of a Jencks statement harmless error because (1) defense counsel had possessed three other Jencks statements for the witness at issue and had failed to impeach the witness's testimony with them; (2) two other witnesses had corroborated the witness's version of events; and (3) physical evidence in the form of a photograph also

corroborated the witness's testimony. 657 A.2d at 1152. In the present case, the defense had no other Jencks statements to use to impeach Ms. Argueta-Avila, and for the reasons already explained we are not sufficiently confident that Mr. Hernandez would have been found guilty at a trial at which Ms. Argueta-Avila did not testify.

In sum, we conclude that the current record does not demonstrate that the error was harmless. We therefore remand for a further inquiry into whether the prosecutor's notes are producible as a Jencks statement. Although we have indicated that in camera review may not be necessary if the trial court has otherwise undertaken an inquiry sufficient to establish that notes do not contain Jencks material, *Lazo*, 54 A.3d at 1232, we think it preferable in the circumstances of this case for the trial court to review the notes at issue in camera, *see, e.g.*, *Johnson*, 800 A.2d at 701 (remanding for trial court to review police officer's notes in camera to determine whether notes contained Jencks material). If the trial court finds that the notes contain Jencks material, the trial court should disclose the pertinent portions of the notes to the defense and permit the parties to brief the question whether nondisclosure was harmless because the notes could not have been used to seriously impeach Ms. Argueta-Avila. *E.g.*, *Medina v. United States*, 61 A.3d 637, 647 (D.C. 2013). If the trial court finds that the nondisclosure was

not harmless, the trial court should vacate the judgment and order a new trial. *Id.* If the trial court concludes that the notes do not contain Jencks material, or that any nondisclosure was harmless, the trial court should make the notes part of the record under seal, supplement its findings, and enter a new final judgment of conviction to preserve Mr. Hernandez's right to seek further appellate review. *Bayer v. United States*, 651 A.2d 308, 312 (D.C. 1994); *Reed v. United States*, 403 A.2d 725, 732 n.9 (D.C. 1979).

*So ordered.*